**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **SCOTT TURNER,**<br>**Plaintiff,**<br>**v.**<br>**NEW JERSEY STATE POLICE, et al,**<br>**Defendants.** | Civ. No. 08-5163 (KM) (JBC)<br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

The plaintiff in this action is Scott Turner, formerly a sergeant with the New Jersey State Police ("NJSP"). Turner contends that during his tenure he was subjected to unlawful retaliation after refusing to participate in fraud and other forms of misconduct in connection with the implementation of a Consent Decree. He has brought this action against a host of state agencies and officials.[1] He asserts claims under the federal and state constitutions; the Conscientious Employee Protection Act ("CEPA"), N.J. Stat. Ann. § 34:19-1 *et seq.*; the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5-1 *et seq.*; Intentional Infliction of Emotional Distress; Negligence; Tortious Interference with a Contract; the National Labor Relations Act ("NLRA"), 29 U.S.C. § 8(b)(1)(A); the Federal Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2615; the New Jersey Family Leave Act ("NJFLA"), N.J. Stat. Ann. §

---

[1] The defendants named in this action are the New Jersey State Police, the State of New Jersey, the Department of Law & Public Safety, the Office of the Attorney General, the Office of State Affairs, the Office of State Police Affairs, Joseph Fuentes, Thomas Flarity, Matthew Wilson, William Meddis, Robert Dziobak, Arlene Olcheski, Francis White, Marshall Brown, David Torres, Chad Cuneo, Keith Hackett, Daniel Giaquinto, Deisha Jackson, Zulima Farber, Stuart Rabner, Ann Milgram, Manuel Quinoa, and Thomas Gilbert.

34:11b-1 *et seq.*; and the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, 1962(b)–(d), and § 1964. (Compl., Counts 1–14)[2]

The NJSP agreed to the Consent Decree in question in 1999 following a 1998 highway traffic stop during which NJSP troopers wounded three unarmed black men while shooting at their van.[3] Under the Consent Decree, federal monitors oversaw an overhaul of NJSP training and supervisory practices and policies and tracked traffic stops for signs of racial profiling. The Consent Decree was a stunning success. By 2007, the NJSP "appear[ed] to have reached a watershed moment" during which "[a]mple evidence exist[ed] that the agency ha[d] become self-monitoring and self-correcting to a degree not often observed in American law enforcement." Independent Monitors' Sixteenth Report, *USA v. State of New Jersey*, 3:99-cv-05970-MLC-JJH, ECF no. 93, at 105. After several years of consistent compliance, the United States Justice Department and the State filed a joint motion to dissolve the Consent Decree, and, on September 21, 2009, Judge Mary L. Cooper signed an order terminating the decree. *USA v. State of New Jersey,* 3:99-cv-05970-MLC-JJH, ECF no. 111.

---

2 Citations to the record will be abbreviated as follows:

"Compl." = Second Amended Complaint (ECF no. 21)

"RICO Case Statement" = Plaintiff's RICO Case Order (copy at ECF no. 27-1)

"Def. Facts" = Defendants' Statement of Material Facts (ECF no. 211-1)

"Pl. Facts" = Plaintiff's Statement of Material Facts (ECF no. 218-2)

"Def. Mot." = Brief of Defendants in Support of Summary Judgment Motion (ECF no. 211)

"Pl. Opp." = Plaintiff's Memorandum of Law in Opposition to Defendants Motion for Summary Judgment (ECF no. 218)

"Def. Reply" = Defendants' Reply Brief (ECF no. 223)

"Turner Aff." = Plaintiff's Affidavit (ECF no. 218-1)

3 The Associated Press, *Oversight of New Jersey State Police is Ended*, N.Y. Times, Sept. 21, 2009, at A28, *also available at* http://www.nytimes.com/2009/09/22/nyregion/22profile.html.

Now before the Court is Defendants' motion for summary judgment as to all counts. (ECF no. 211) For the reasons set forth herein, Defendants' motion is granted as to all counts.

## I. Background

### A. Procedural History

This case has a tortuous nine-year procedural history. Turner has attempted to file nine amended complaints and several supplemental pleadings, and the case has been assigned to three different district court judges and four different magistrate judges. Some, though not all, of that history is summarized in my opinion on a prior motion. (*See* ECF no. 187) Here, I will focus on the procedural facts most pertinent to this motion.

Turner commenced this action by filing his original complaint on October 20, 2008. (ECF no. 1) Turner's attorney withdrew from the case on December 11, 2009. (ECF No. 20) Although Turner has proceeded *pro se* since that date, since 2010 he has been an attorney licensed to practice in the State of New York.

On March 29, 2010, then-Magistrate Judge Madeline Arleo entered a text order (ECF no. 30) striking all of the amended complaints except the one most recently filed. That amended pleading (ECF no. 21), the order said, would be designated as Turner's second amended complaint and would be deemed filed as of the date of the order. Although Turner subsequently attempted to file three supplemental pleadings (ECF nos. 145, 164, and 178), each was struck for failure to comply with specific orders of the Magistrate Judge. On April 22, 2015, I ordered that "no further complaints or supplemental pleadings will be filed." (Order, ECF no. 188) The Second Amended Complaint, deemed filed on December 28, 2009 (ECF no. 21, referred to herein as the "Complaint"), is therefore the currently operative pleading in this case. Finally, on March 11, 2016, Defendants filed the motion for summary judgment (ECF no. 211) that is now before the Court.

**B. The Parties' Submissions on Summary Judgment**

The briefs and the statements of material facts submitted pursuant to Local Rule 56.1 in many respects fail to present clearly the issues genuinely in dispute. For that failure to join issue, there is some fault on both sides.

Defendants do meticulously cite to the record. Certain of their grounds for simply writing off Turner's affidavit (and attached exhibits), however, are patently inadequate.

First, Defendants argue that the Court should not consider Turner's affidavit because it lacks a statement, under penalty of perjury, that the document's contents are true and correct, as required by 28 U.S.C. § 1746. (Def. Reply 2) At most, this would be a formal defect; remediation, if necessary, could easily be sought through a telephone call between counsel or, failing that, a conference with the Magistrate Judge. Defendants could perhaps be forgiven for being picayune if they were correct, but they are not. Section 1746 merely provides that where a sworn affidavit is required, an unsworn declaration may be substituted "with like force and effect."[4] Turner's

---

[4] Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:

* * *

(2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).

(Signature)".

28 U.S.C. § 1746.

submission, however, *is* a sworn declaration—an affidavit, in fact.[5]

Second, and more plausibly, Defendants note that in some places Turner's affidavit does not conform to Local Civil Rule 7.2(a), which states:

> Affidavits . . . shall be restricted to statements of fact within the personal knowledge of the signatory. Argument of the facts and the law shall not be contained in such documents. Legal arguments and summations in such documents will be disregarded by the Court and may subject the signatory to appropriate censure, sanctions or both.

Defendants are not wrong to identify several argumentative paragraphs. (Def. Reply 3) Again, however, Defendants exceed the bounds of the reasonable in asserting that Plaintiff's entire opposition must be struck, leaving them the victors. Unless it is simply impractical to do so, a "court will disregard only the inadmissible portions of a challenged affidavit and consider the rest of it." 10B C. Wright & A. Miller, Federal Practice and Procedure § 2738 (4th ed.) (citing *Dickheiser v. Pennsylvania R. Co.*, 5 F.R.D. 5, 7 (E.D. Pa. 1945), *aff'd,* 155 F.2d 266 (3d Cir. 1946)).

Third, Defendants urge that the Court disregard paragraphs of the affidavit that are "either a verbatim recitation or summary of certain paragraphs contained in the . . . Complaint." (Def. Reply 3–4) It is of course true that, in opposing a motion for summary judgment, the non-moving plaintiff cannot rest on the unsworn allegations of the complaint. Rather, that party must submit evidence sufficient to demonstrate the existence of a genuine, material issue of fact. *See Celotex Corp., v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548 (1986).

---

5 The affidavit is prefaced with the statement "I, SCOTT TURNER, being duly sworn, state the following." It is subscribed by Turner and dated September 11, 2016. Further, the jurat at the end of the document, "SUBSCRIBED AND SWORN to before me on this 11th day of September 2016," is signed by a notary public, Christopher Larriva, and it bears the notary's seal. (Turner Aff. pp. 1, 15) The notary's jurat is sufficient. *See United States v. Johnson*, 25 F. App'x 231, 238 (6th Cir. 2001); *Chrzaszcz v. United States*, No. CR 09-1381-PHX-JAT, 2015 WL 2193713, at *7 (D. Ariz. May 11, 2015); *Taylor & Fulton Packing, LLC v. Marco Int'l Foods, LLC*, No. 09-CV-2614, 2011 WL 6329194, at *4 n.2 (E.D.N.Y. Dec. 16, 2011).

That is a rule of proof, not prosody; it does not mean that a plaintiff, in his affidavit, must find new ways to phrase facts already described in the complaint. Turner's Complaint is not verified, and I do not consider it as evidence.[6] I do, however, consider Turner's affidavit. The statements in the affidavit are not disqualified by virtue of their overlapping the allegations of the complaint.

Not to be outdone, Turner attempts to preclude the Defendants from citing and relying on excerpts of his own deposition testimony. (Def. Mot. Ex. I) Turner objects that when he requested a copy of the transcript from Defendants, they told him to purchase his own, which he says he cannot afford to do. (Pl. Facts ¶ 52) Even assuming Turner is insolvent, which I do not,[7] I am not aware of his ever having applied to proceed *in forma pauperis*. Nor does it seem rational or equitable to deny a defendant the right to rely on a plaintiff's sworn deposition.

Turner makes the more focused objection that the Defendants cited certain portions of his deposition in their moving brief, but failed to attach the relevant transcript excerpts. Defendants acknowledge the lapse, and have responded by submitting the omitted transcript excerpts with their reply brief as Exhibit 2. Their citations and quotations can now be checked for accuracy. Turner has not sought leave to contest or respond to anything contained in

---

6 A complaint—when verified, and hence sworn—is sometimes treated as an affidavit for purposes of summary judgment. *See Bernard v. Stanfield*, No. CIV 07-3394 JBS/AMD, 2009 WL 5205272, at *1 (D.N.J. Dec. 22, 2009) ("The only way Plaintiff could even be deemed to have opposed summary judgment is if his complaint constituted a kind of verified pleading.") (citing *U.S. v. Premises Known as 717 South Woodward Street, Allentown, Pa.*, 2 F.3d 529, 531 (3d Cir. 1993) (relying in part on sworn pleadings admitted by district court as evidence)); *Simpson v. Horn*, 25 F. Supp. 2d 563, 566 n.3 (E.D. Pa. 1998) ("In *pro se* cases, I generally treat verified pleadings as affidavits.") (citing *Reese v. Sparks*, 760 F.2d 64, 67 (3d Cir. 1985) (treating verified *pro se* complaint as affidavit in opposition to summary judgment)).

7 Defendants dispute that Turner is insolvent. At any rate, Turner states that he is a practicing lawyer, and he did not file his Complaint *in forma pauperis*.

those excerpts. Seeing no procedural unfairness, I therefore will not exclude those portions of his deposition from consideration.

Turner's own citations to the record in some cases fail to support his assertions, and in other cases are so general as to be unhelpful. That is particularly true of Turner's Statement of Material Facts. I consider the allegations therein, however, to the extent I can trace them to the evidence of record.

In addition, Turner claims that the factual assertions in his RICO case statement, *see* Loc. Civ. R. App'x O, constitute proof because the Defendants "do not deny" them. (Turner Aff. ¶ 93) I disagree. This District's Local Rules do not require a responsive pleading to a RICO case statement.

All of this is prologue to my saying that I have concentrated on Turner's Statement of Material Facts and Affidavit, and have examined the record in search of evidentiary support. I have resorted to the Complaint, RICO Case Statement, and other filings to establish the context of Turner's claims.

### C. Background Facts

On July 28, 1988, Scott Turner enlisted in the NJSP. (Pl. Facts ¶ 30) In December 1999, the United States and the State of New Jersey entered into a Consent Decree to settle allegations that the NJSP had engaged in a practice of racially discriminatory traffic stops. Consent Decree, *United States v. State of New Jersey*, 3:99-cv-05970-MLC-JJH, ECF no. 5 (D.N.J. December 29, 1999);[8] *see also* Pl. Opp. Ex. 1 (joint application for the Consent Decree).[9] Pursuant to the terms of the Consent Decree, an independent monitoring team was appointed to "monitor and report on the State's implementation of th[e] Decree."[10] Some of the provisions, or "tasks," of the Consent Decree concern

---

8 The Consent Decree is not in the record, but I take judicial notice of its existence.

9 The federal case was closed the following day, a fact that will be relevant later on. *Id.* (unnumbered ECF docket entry on Dec. 30, 1999).

10 The Consent Decree, paragraph 116, states:

NJSP training. (Consent Decree ¶¶ 93–109) The Consent Decree remained in effect until 2009, when it was dissolved by order of the Hon. Mary L. Cooper, United States District Judge.

On or about June 26, 2004, Turner was assigned to the NJSP Academy ("Training Bureau") as head of the Research and Innovation Unit ("RIU"). (Def. Facts ¶ 1; Pl. Facts ¶ 32) Turner's responsibilities included the "oversight and evaluation of state police training compliance with [NJSP] and Consent Decree mandates." (Def. Facts ¶ 2) In his capacity as Unit Head, Turner supervised a staff of auditors and researchers assigned to monitor and evaluate compliance. (Pl. Facts ¶ 34) He "reported to the commanding officer, attended Training Bureau and Human Resource Section meetings, delivered presentations within and without the bureau on compliance and research issues, published compliance reports and offered his assessment of Consent Decree compliance to the Independent Monitors, other Unit Heads, lawyers for the Office of State Police Affairs, and the Independent Monitors." (Pl. Facts ¶ 33)

Between December 20, 2004, and September 2007, Independent Monitors' Reports found that NJSP was in compliance with the Consent Decree's terms.[11] (Def. Mot. Ex. B) Turner asserts that during this period the

---

> The Monitor shall be an agent of the Court and may testify in this case regarding any matter relating to the implementation, enforcement, or dissolution of this Decree. The Monitor shall not testify in any other litigation or issue statements or make findings with regard to any act or omission of the defendants, or their agents or representatives, except as required or expressly authorized by the terms of this Decree or by the Court. The Monitor shall not be retained by any current or future litigant or claimant in a claim or suit against the State or its troopers.

11 Turner disputes this fact, arguing that Defendants omitted portions of the Eleventh Monitoring Period report recording the "monitors concerns regarding deficiencies and lack of data." (Pl. Facts ¶ 4) However, I take judicial notice that the period covered by that report ended on September 30, 2004. (*United States v. State of New Jersey* 3:99-cv-05970-MLC-JJH, ECF no. 61 at 1) Turner further questions the credibility of the press releases regarding the monitors' reports. (Pl. Facts ¶ 4)

Although this case is nine years old, Turner's submission does not so much as identify the particular paragraphs of the Consent Decree on which his claims rest. Tasks 93 and 104 may be the ones that best correspond to his contentions. (*See, e.g.*,

Training Bureau was not in fact compliant at all times, particularly in regard to a search and seizure training program. (Turner Aff. ¶ 24) According to Turner, starting in September 2005, he was pressured by certain defendants to change his assessment when reporting to the monitors. When Turner refused, defendant Thomas Flarity allegedly responded with a threat, asking Turner if he "thought [he] was God" and warning Turner that if he persisted in his assessment he "would stand alone." (Turner Aff. ¶¶ 27–29) Defendants, on the other hand, characterize the situation as a difference of opinion; Turner, they say, had no basis for any belief that reports to the monitors were fraudulent or that the training programs were noncompliant. (Def. Mot. 41)

Turner met with the monitors in October 2005. (Turner Aff. ¶ 30) At the meeting he described to the monitors his view on the Training Bureau's "current state of affairs." Turner did *not* report to the monitor that there was noncompliance. Rather, he says, the monitor told *him* that the data reporting was incomplete.[12] According to Turner, following this meeting he was

---

Def. Mot. Ex. K) I take judicial notice that all of the Monitors' Reports covering the period between December 20, 2004, and September 2007, found the Training Bureau in compliance with Tasks 93 and 104 of the Consent Decree concerning the "development and evaluation of quality of training programs" and "systems improvement processes for police training." (*United States v. State of New Jersey*, ECF no. 65-3 at 66, 80, ECF no. 67 at 64, 77, ECF no. 70-3 at 63, 70, ECF no. 75-5 at 70, 79, ECF no. 92-5 at 81, 90, ECF no. 106-2 at 95, 105)

12 At his deposition, Turner was asked:

> Q. Did you tell the monitor . . . that they were going to try to fraudulently present material to her?
>
> A. No, no, I never told her that. . . . I told her that—our current state of affairs. What I did—rather than acting like a whistle blower, what I did was I tried to work with people and try to fix it.
>
> * * *
>
> Q. Mr. Turner, did you tell the monitor these guys are either going to present you fraudulent data or they don't have the data or I've been telling them that they don't have the data and they're ignoring me? Did you tell her anything like that?
>
> A. No. . . . I told her our current—I gave her my evaluation of what our current state of affairs was.

instructed to generate reports with positive evaluations of compliance. (Turner Aff. ¶¶ 37, 40) Turner also asserts that he was repeatedly retaliated against for not participating in the "fraud" taking place at the Training Bureau. The NJSP officials most directly involved in the alleged retaliation were Matthew Wilson, Robert Dziobak, and Thomas Flarity. NJSP Superintendent Joseph Fuentes is also alleged to have been directly involved in retaliatory decisions relating to promotion and demotion.

Turner relates many acts of alleged retaliation between September 2005 and September 2006. In November 2005, four NJSP members were promoted, but Turner was passed over. That occurred despite Turner's having been ranked third in line for a promotion around July 2005. (Turner Aff. ¶¶ 26, 35, 49) Also in November 2005, Wilson warned Turner several times to "be careful in the future." (*Id.* ¶ 36) In December 2005, Turner was berated at length by Flarity, who said Turner might have "outlived [his] usefulness." (*Id.* ¶ 37)

In September 2006, Wilson issued Turner a Performance Notice for being out of the office during duty hours (Turner says he was on vacation leave); asked Turner if he "wanted a transfer"; and told Turner that he "wanted [Turner] to know where he was coming from." (*Id.* ¶¶ 52–54) Also in September 2006, Wilson informed Turner that, pursuant to a reorganization of the entire Training Bureau, Turner's unit was being dissolved and he would be demoted from Unit Head to Assistant Unit Head in another unit. Of approximately 50 troopers affected by the reorganization, Turner was allegedly the only one to experience a demotion or change in position title. (*Id.* ¶ 56. Turner states this as a fact in his affidavit, but offers no particulars or supporting evidence.) At the end of September 2006, Wilson filed a reportable incident form stating that Turner may have misrepresented facts when he told Wilson that he had not

---

(Def. Reply Ex. 2, 261:3–25, 262:1–6; *see also* Def. Facts ¶ 21)

received a response to a labor grievance he had filed.[13] (*Id.* ¶¶ 57–61; Def. Mot. Ex. P) Turner was also passed over for promotion in 2006. (Turner Aff. ¶¶ 63, 67)

In November 2006, Turner testified publicly in Trenton before the Governor's Advisory Committee on Police Standards ("GACPS"). He does not supply a copy of his statements, but says they related to his "concerns relating to lifting the Consent Decree and corruption within the Office of Attorney General and State Police." (*Id.* ¶ 64)

Then, in January 2007, Wilson and Dziobak threatened a new internal affairs investigation against Turner for stating in a report[14] that "no assessment had been conduct[ed]." This, Turner admits, seems to have been nothing more than their misunderstanding of the definition of a particular *kind* of assessment, a "needs assessment." (*Id.* ¶ 68) Also in January 2007, Wilson allegedly counseled Turner (or issued a counseling notice) for failing to attend mandatory pistol shoot training. Turner attributes his absence to being on sick leave. (*Id.* ¶ 71) However, according to Wilson's log entry, Turner's failure to fulfill the requirement was unrelated to his sick leave. (Def. Mot. Ex. S) Then, in May 2007, Dziobak called Turner "weird," and "threatened [him] with charges."[15] (*Id.* ¶ 73)

Between December 2005 and sometime in 2007, Turner filed or orally reported many "retaliation" or "misconduct" complaints and "grievances" against Flarity, Wilson, and Dzioback. (*Id.* ¶¶ 38, 41, 49, 55, 57, 70–71, 73–74) According to Turner some of these complaints were not investigated. (*Id.* ¶¶ 55,

---

13 Although Turner's affidavit dates these events in October 2006, the misconduct complaint to which Turner apparently refers is Exhibit P to Defendants' Motion, which is dated September 29, 2006, and recounts events occurring two days earlier.

14 Turner does not specify, but the report seems to be an internal report.

15 As discussed below, the charges appear to refer to Dziobak's alleged warning that he would "write up" Turner if he did not meet a deadline for submitting a subordinate's evaluation. Turner also states that Dziobak "generally harassed and threatened" Turner in some unspecified way throughout the spring. These statements are too vague to be considered as evidence.

70) Sometime in 2007, Wilson's attorney threatened legal action against Turner if he did not stop filing complaints against Wilson. (*Id.* ¶ 74)

Sometime in 2007, Turner was promoted to Acting Lieutenant. (Def. Reply Ex. 5 at 295:1–4) Then, on July 7, 2008, Turner was placed on temporary off duty status. (Def. Facts ¶ 14) On July 24, 2008, Captain Robin Blaker completed a performance notice explaining that Turner was "non-compliant with the provisions of [NJSP physical fitness regulations] and therefore subject to the sanctions stated therein." (Def. Facts ¶ 16; Def. Mot. Ex. G).[16] On October 23, 2008, Captain Blaker completed an intervention narrative noting Turner's non-compliance with the physical fitness regulations and recording that Turner had been advised, via a letter mailed on October 10, 2008, "of his removal from his out-of-title Unit Head position effective October 25, 2008."[17] (Def. Mot. Ex. H)

In April 2009, the NJSP began investigating Turner for violating its medical leave policy—essentially, for claiming injury but failing to be either at home or a "place of recovery" as required by department policy. *See Turner v. New Jersey State Police*, No. 08-CV-5163 KM, ECF no. 187, 2015 WL 1850001, at *2–3 (D.N.J. Apr. 22, 2015). Among other things, Turner was allegedly seen in proximity to New York Law School, where he was then enrolled, in April 2009. This set in motion a series of events leading to a final administrative order of dismissal in December 2014. *Id.* That investigation and subsequent events largely post-date the matters raised in this federal action. They were raised in Turner's State case, however. There, they are the subject of an appeal recently decided by the Appellate Division of the New Jersey Superior Court,

---

16 Turner claims that he never received the notice. The copy that Defendants have attached as Exhibit G to their motion does not contain Turner's signature acknowledging receipt. Nor does it contain his supervisor's signature. (Def. Mot. Ex. G; Pl. Facts ¶ 17)

17 Although Turner claims that either the intervention narrative itself or the letter advising him of his demotion were never delivered, he does admit that he was informed of his demotion in October 2008. (Pl. Facts ¶ 17)

which remanded the matter to the Office of Administrative Law for findings as to NJSP's compliance with procedural timing requirements and, if necessary, consideration of the merits. *In re Matter of Turner*, No. A-2479-14T4, 2016 WL 6311240, at *6 (N.J. Super. Ct. App. Div. Oct. 28, 2016).

## II. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243

F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

A *pro se* litigant is ordinarily entitled to considerable leeway. *See Niblack v. Murray*, No. CV126910MASTJB, 2016 WL 4086775, at *1 n.1 (D.N.J. July 29, 2016) (citing *Pratt v. Port Auth. of N. Y. & N.J.*, 563 F. App'x 132, 134 (3d Cir. 2014) ("[B]ecause [the plaintiff] is proceeding pro se, we will construe his brief liberally."); *Marcinek v. Comm'r*, 467 F. App'x 153, 154 (3d Cir. 2012) (holding that courts are "under an obligation to liberally construe the submissions of a pro se litigant")). Attorney *pro se* litigants are not accorded the same consideration as *pro se* litigants who lack substantial legal training. *Kenny v. United States*, No. CIV 08–3921 GEB, 2009 WL 276511, at *8 (D.N.J. Feb. 5, 2009) (Brown, C.J.) ("[T]his pro se Plaintiff is an attorney, and therefore, has substantial legal training and professional experience, undermining the rationale set forth by the Supreme Court in *Haines v. Kerner*, 404 U.S. 519, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972).") (citing *Allen v. Aytch*, 535 F.2d 817, 821 n. 21 (3d Cir. 1976) (stating that a third year law student who drafted a complaint had "substantial legal training" and therefore declining to construe the complaint liberally)).

This case is an unusual hybrid. Turner was represented by an attorney in 2008, when he filed the Complaint. The attorney withdrew in 2009, and Turner proceeded *pro se*. At that time, Turner must have been close to completion of his legal education, because fairly soon thereafter, he became a

licensed attorney himself.[18] In 2016, when Turner filed his opposition to summary judgment, he had been a licensed attorney for five or six years. Turner's summary judgment affidavit relates that he has represented clients accused of racketeering and other crimes. (Turner Aff. ¶¶5, 7) In representing others, he would be held to the standard of an attorney, so it is not unfair to hold him to the same standard when representing himself. All told, this is not a case requiring the kind of leniency shown, for example, a prisoner plaintiff. I nevertheless have examined the record of the case to determine whether a triable issue is presented. *See* Fed. R. Civ. P. 56(c)(3).

## III. Threshold Grounds

In advance of any count-by-count analysis of Turner's causes of action, some initial pruning is in order. After nine years of litigation, there has apparently been little or no narrowing of the issues, even to eliminate obviously defective claims.

At the threshold, it is clear that certain claims as to certain defendants lack sufficient support to go forward. I first dismiss Counts 5 and 7, which Turner does not seem to be pressing (Section III.A). I then dismiss certain defendants altogether on Eleventh Amendment grounds (Section III.B). Next I dismiss four more individual defendants against whom no significant allegations are made (Section III.C). That leaves ten individual defendants, sued in their personal capacities. As to them, I review the sufficiency of the allegations and evidence (Section IV).

---

18 By 2010, Turner was an attorney, admitted to the New York bar. *See* https://iapps.courts.state.ny.us/attorney/AttorneyDetails?attorneyId=330011507. (Turner acknowledged at oral argument that this entry refers to him.) At an April 2011 hearing, "Judge Arleo informed Plaintiff that, as a lawyer, he would be held to a higher standard than that of a non-lawyer *pro se* plaintiff." (ECF no. 146 at 12) (citing April 21, 2011 Tr. 66:7–20, ECF no. 125)

**A. Withdrawn Claims (Counts 5 and 7)**

In the interrelated fifth and seventh causes of action of the Complaint, Turner alleges that Defendants' actions constitute both tortious interference with a contractual relationship and violations of the National Labor Relations Act ("NLRA"). Turner at one point stated that he voluntarily withdrew these claims, although there is no order to that effect. (Plaintiff's Brief in Opposition to Defendant's Motion for Judgment on the Pleadings, ECF no. 132, at 13) ("Plaintiff voluntarily withdraws his NLRA and interference with contract claims.") Defendants argue that this Court lacks subject matter jurisdiction over these issues. (Def. Mot. 20–22) Turner offers no response, confirming that he is not pressing these claims.

For these reasons, I will grant summary judgment for Defendants on Counts 5 and 7.

**B. Eleventh Amendment/Sovereign Immunity**

Defendants argue that all of Turner's claims, except those asserted against individual defendants in their personal capacities, are barred by the Eleventh Amendment. (Def. Mot. 26–28) I agree.

The Eleventh Amendment to the Constitution guarantees the states' immunity from certain claims: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Despite the limited scope of its wording, for over a century the Eleventh Amendment has been held to incorporate a more general principle of sovereign immunity that bars citizens from bringing suits for damages against any state in federal court. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 100–01, 104 S. Ct. 900 (1984); *Kelley v. Edison Twp.,* No. 03–4817, 2006 WL 1084217, at *6 (D.N.J. Apr. 25, 2006) (citing *Bennett v. City of Atl. City,* 288 F. Supp. 2d 675, 679 (D.N.J. 2003)); *see also Seminole Tribe of Florida v. Florida,* 517 U.S. 44,

54, 116 S. Ct. 1114 (1996); *Edelman v. Jordan,* 415 U.S. 651, 662–63, 94 S. Ct. 1347 (1974); *Hans v. Louisiana,* 134 U.S. 1, 10 S. Ct. 504 (1890).

As a result, the sovereign immunity conferred by the Eleventh Amendment "is a jurisdictional bar which deprives federal courts of subject matter jurisdiction" over states that have not consented to suit. *Blanciak v. Allegheny Ludlum Corp.,* 77 F.3d 690, 693 n.2 (3d Cir. 1996) (citing *Halderman,* 465 U.S. at 98–100, 104 S. Ct. 900). This immunity extends to private suits against "state agencies, departments, and officials when the state is the real party in interest." *Pennsylvania Fed'n of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310, 323 (3d Cir. 2002) (quoting *Alden v. Maine*, 527 U.S. 706, 751, 119 S. Ct. 2240 (1999)); *see also Antonelli v. New Jersey,* 310 F. Supp. 2d 700, 712 (D.N.J. 2004) (noting that "[s]overeign immunity is routinely extended to state agencies and state officials acting in their official capacities where it is show that the state is the real, substantial party in interest"), *aff'd,* 419 F.3d 267 (3d Cir. 2005).[19]

One defendant here, of course, is the State of New Jersey itself. The plaintiff also sues the NJSP, the Department of Law & Public Safety, the Office of the Attorney General, the Office of State Affairs, and the Office of State Police Affairs, which are all state agencies or departments. (I will refer to these defendants collectively as the "State Defendants".) Those State Defendants are immune from suit in federal court under the Eleventh Amendment. The individual defendants sued in their official capacities are all current or former employees of the State Defendants. To the extent they are sued in their official capacities, these individual defendants, too, partake of the State's Eleventh

---

19 Where an entity's status as an "arm of the State" is in doubt, the courts will consider "the source of the money that would pay the judgment," "the status of the entity under state law," and "the entity's degree of autonomy." *Haybarger v. Lawrence County Adult Prob. & Parole,* 551 F.3d 193, 198 (3d Cir. 2008) (citing *Fitchik v. N.J. Transit Rail Operations, Inc.*, 873 F.2d 655, 659 (3d Cir. 1989)). This is not, however, a doubtful case requiring application of the *Fitchik* factors; the defendants in question are the State of New Jersey itself, and actual agencies, departments, or employees of the State.

Amendment immunity. (*See* Compl., Jurisdiction, ¶¶ 7–22) Turner does not really argue otherwise.

Rather, Turner contends that Defendants waived Eleventh Amendment immunity by consenting to suit in federal court. "Defendants, via their counsel [Deputy Attorney General ("DAG")] Rizzo, made a clear declaration to Plaintiff through his counsel, that defendant(s) intended to submit to this Court's jurisdiction . . . which was reported by [Turner's erstwhile attorney, Herbert J.] Tan in a letter to this Court." (Pl. Opp. 12) That letter, dated August 25, 2009, says nothing resembling Turner's conclusory paraphrase of it. Tan states only that "[i]n my conversation with Deputy Attorney General Vincent Rizzo, around the middle of July, he stated that he plans o[n] filing a motion related to the federal matter but has done nothing in the interim." (Letter to Judge Wigenton, August 25, 2009, ECF no. 13)[20]

It is true that a state may be deemed to have waived its Eleventh Amendment immunity from suit in federal court if it "voluntarily invokes" federal jurisdiction or "makes a 'clear declaration' that it intends to submit itself to [federal court] jurisdiction." *Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676, 119 S. Ct. 2219, 2226 (1999). Turner's argument, however, does not comport with precedent or reason. A government attorney's statement in conversation that he "plans o[n] filing a motion" in the federal action is not a waiver of sovereign immunity; indeed, it may amount to a statement of intent to *assert* sovereign immunity, as indeed the State has done here.

---

20 Plaintiff also refers to his Brief in Support of Motion to Compel/Sanctions, ECF no. 52-4, where he implies that there was an agreement between DAG Rizzo and Mr. Tan that Defendants would file a motion in federal court in exchange for Turner's not opposing a motion to dismiss in a state court action. (*See* Pl. Opp. 12) (citing Pl. Br. in Support of Mot. to Compel/Sanctions, ECF no. 52-4 at 3) To support this claim he attaches the August 25, 2009 letter from Mr. Tan (ECF no. 52-6 at 14), and the state court dismissal order (ECF no. 52-6 at 11–12). These exhibits do not support Turner's argument. Further, even if Turner's account were supported, Defendants' agreement to "file a motion" would not constitute a clear declaration of submission to federal court jurisdiction. *See infra.*

A state defendant may waive its Eleventh Amendment "forum immunity" by conduct—most commonly, by removing a state court action to federal court. *See, e.g., Lombardo v. Pennsylvania, Dep't of Pub. Welfare*, 540 F.3d 190 (3d Cir. 2008). At oral argument, Turner seemed to indicate that the State acquiesced in his plan to drop the state action and proceed in federal court. That does not amount to a clear waiver. The plaintiff chose this federal forum. The State does not waive its Eleventh Amendment immunity by filing, or stating an intent to file, a motion in response. Turner's theory cannot account for the many cases in which states routinely invoke, and are granted, Eleventh Amendment immunity by filing motions to dismiss on jurisdictional grounds, pursuant to Fed. R. Civ. P. 12(b)(1). *See, e.g., Blanciak*, 77 F.3d at 694 n.2 (defendant's Eleventh Amendment objection on summary judgment "may properly be considered a motion to dismiss the complaint for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1)").

The claims against the State entities and the individual defendants in their official capacities must be dismissed; the Eleventh Amendment bars their assertion in federal court.[21] Because defendants Jackson, Farber, Rabner, and

---

[21] At any rate, parallel grounds, not subject to a waiver, would compel the same result as to many claims. The Eleventh Amendment aside, a state, state agencies, and state officials in their official capacities are not "persons" who may be sued under 42 U.S.C. § 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70–71, 109 S. Ct. 2304 (1989). The same holds true under the New Jersey Civil Rights Act, N.J. Stat. Ann. § 10:6–2. *See Didiano v. Balicki*, 488 F. App'x 634, 639 (3d Cir. 2012) (concluding that the New Jersey statutes explicitly exclude the State, or its functional equivalents, from the definition of a "person" under N.J. Stat. Ann. § 1:1–2).

Although sovereign immunity does not bar § 1983 claims against state officials sued in their official capacities for prospective, injunctive relief, *see Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441 (1908), Turner requests injunctive relief only in his claims for FMLA interference and retaliation (Compl., Count 9, ¶ 10) and reverse discrimination motivated by race (Compl., Count 12, ¶ 13). In his prayer for relief, he also generally "requests injunctive relief against Defendants' aggressive conduct towards Plaintiff's family." (Compl. p. 50) As discussed *infra*, there is no evidence in the record to support reverse discrimination or the allegations of aggressive conduct towards Turner's family. Turner also has not supported his FMLA claims, as discussed below.

Milgram were sued in their official capacities only (Compl., Jurisdiction, ¶¶ 19–20), all counts against them are dismissed.

### C. Lack of Relevant Evidence as to Four Defendants

I must consider, then, whether the remaining fourteen individual defendants sued in their personal capacities are entitled to summary judgment. Each count of the Complaint seems to be asserted against all defendants. This group pleading sometimes makes it difficult to ascertain which allegations apply to whom.[22] As to four of these defendants, however, the record contains insufficient evidence of liability under any theory pled. Those four dismissable defendants are Torres,[23] Giaquinto,[24] Quinoa,[25] and Hackett.[26] As to them,

---

22 A complaint's failure to differentiate between defendants can warrant dismissal in and of itself, under Fed. R. Civ. P. 8(a). *See Galicki v. New Jersey*, No. CIV.A. 14-169 JLL, 2015 WL 3970297, at *3 (D.N.J. June 29, 2015) (dismissing section 1983 claim where "Plaintiffs simply lump[ed] all Defendants together, failing to put Defendants on notice of their own alleged wrongdoing.") The Court has perhaps accorded Turner undue leeway in that respect, but there is little point in reverting to the motion to dismiss stage now. I will consider whether the evidence in the summary judgment record supports a cause of action against each individual defendant.

23 Torres is mentioned only once in the pleadings or record evidence. Those references go no farther than to identify him as a lieutenant in the State Police. (Compl., Jurisdiction, ¶ 15)

24 Giaquinto, identified in the Complaint as an assistant attorney general (Compl., Jurisdiction, ¶ 18), is scarcely mentioned in the record evidence. Turner's affidavit states that DAG Jackson failed to report Turner's retaliation complaint to Giaquinto and tars Giaquinto as a defendant named in Sgt. Glenn Teryek's discrimination and CEPA lawsuit (Turner Aff. ¶¶ 38–39). There is no evidence suggesting that Giaquinto should have known of a complaint that he concededly did not receive. For what it is worth, Teryek's suit has been dismissed, and the Appellate Division has affirmed the dismissal. *Teryek v. State*, No. A-3647-07T1, 2011 WL 977515 (N.J. Super. Ct. App. Div. Mar. 22, 2011).

Turner's vague and conclusory assertion that Giaquinto was among a group that "suppressed and concealed the corruption taking place in the Training Bureau between 2005 and 2010 and directed and controlled the internal control mechanism of the agency to that end" (Turner Aff. ¶ 89), is not sufficient to defeat a motion for summary judgment. Finally, Giaquinto is mentioned in an Office of the Attorney General Press Release of July 14, 2005 as noting that the "Monitoring Team was impressed by the performance of the State Police supervisors." (ECF no. 211-7 at 6)

summary judgment is granted.

The roster of defendants, then, is reduced to ten: Flarity, Wilson, Dzioback, Olcheski, White, Fuentes, Meddis, Brown, Cuneo, and Gilbert. The term "Defendants," as used in the remainder of this Opinion, refers to these ten, all sued in their personal capacities only.

## IV. Analysis of Remaining Counts and Defendants

For each of the remaining defendants, ten individuals sued in their personal capacities, I consider whether there is a genuine dispute of material fact as to each cause of action. Because the briefing is not always clear, I return to the Complaint (except the withdrawn Counts 5 and 7) to define the causes of action being asserted. To the extent practicable, I have organized the discussion of claims thematically:

| | |
|---|---|
| Section IV.A | CEPA Retaliation (Count 2) |
| Section IV.B | First Amendment Retaliation (Count 8) |
| Section IV.C–D | Other constitutional claims (Counts 1, 12) |
| Section IV.E–G | NJLAD (Counts 11, 3, 6) |
| Section IV.H–I | Federal and NJ Family Leave Acts (Counts 9, 10) |
| Section IV.J–K | Civil RICO, RICO Conspiracy (Counts 13, 14) |
| Section IV.L | State common law torts (Count 4) |
| Section IV.M | Supervisory liability |

---

25 The Complaint identifies Quinoa as a Chief in the Office of State Police Affairs (Compl., Jurisdiction, ¶ 21; *see also* RICO Case Statement at 6). Pleadings aside, Quinoa is not mentioned by name anywhere in the record evidence. However, Turner does allege that Flarity told Turner that "this has gotten all the way to the Colonel['s] office, people in the Office of State Police Affairs, the Major['s] Office, and they want to know if you are on the team or not." (Turner Aff. ¶ 38) In addition to possible hearsay concerns, a reference to "people in the Office of State Police Affairs" is not sufficient to create a genuine issue of material fact as to Quinoa's involvement in any of the alleged wrongdoing.

26 Hackett is identified in the RICO Case Statement as the "Commanding Officer assigned to the Office of Professional Standards who conspired to cover up allegations of fraud against the Fuentes Group and used or permitted contrived investigations to be used to retaliate against and intimidate Plaintiff." (RICO Case Statement at 3) However, this conclusory allegation is unsubstantiated, as Hackett's name does not appear in the record evidence.

**A. CEPA Retaliation (Count 2)**

Of Turner's many claims, this one perhaps best fits the factual allegations. In Turner's second cause of action, he alleges that Defendants violated the Conscientious Employee Protection Act ("CEPA"), N.J. Stat. Ann. § 34:19-1 *et seq.*, by subjecting him to "a pattern of retaliation and misconduct in the workplace based in part or in whole on his refusal to participate in misconduct or discrimination or engage in or conceal fraud." (Compl., Count 2, ¶ 2) I conclude that Count 2 does not survive a summary judgment challenge as a matter of law.

CEPA protects employees who engage in certain protected whistleblowing activities from "retaliatory action" by their employers. N.J. Stat. Ann. § 34:19-3. With regard to a prima facie case of retaliation under CEPA, the Third Circuit has extracted from the New Jersey case law four essential elements: "(1) [the employee] reasonably believed her employer was violating a law or rule; (2) she performed a protected whistleblowing activity; (3) an adverse employment action was taken against her; and (4) there is a causal connection between the whistleblowing activity and the adverse action." *Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 240 (3d Cir. 2016); *see also Blackburn v. United Parcel Serv., Inc.*, 179 F.3d 81, 92 (3d Cir. 1999) (quoting *Kolb v. Burns*, 320 N.J. Super. 467, 476, 727 A.2d 525 (App. Div. 1999)).

CEPA protects three different categories of "whistleblowing" conduct. They are: (1) disclosing, or threatening to disclose, (2) providing information or testifying about, or (3) objecting to or refusing to participate in certain wrongful activities. N.J. Stat. Ann. § 34:19-3.

CEPA defines a "retaliatory action" as "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J. Stat. Ann. § 34:19–2(e). Some courts have held that the employer's action must either affect the employee's compensation or rank, or "be virtually equivalent to discharge." *Klein v. Univ. of Med. & Dentistry of New Jersey*, 377 N.J. Super. 28, 871 A.2d

681, 691 (App. Div. 2005). *See also Caver v. City of Trenton,* 420 F.3d 243, 249 (3d Cir. 2005) (quoting same language). Other cases, with which I agree, have taken a broader view. Examples of actionable retaliatory conduct have included suspensions, demotions, changes to the length of the workday, changes in salary, hours, fringe benefits, or "physical arrangements and facilities," and altered "promotional procedures." *Beasley v. Passaic County,* 377 N.J. Super. 585, 873 A.2d 673, 685–86 (App. Div. 2005). *See also Smith v. Twp. Of E. Greenwich,* 519 F. Supp. 2d 493, 511 (D.N.J. 2007) *aff'd,* 344 F. App'x 740 (3d Cir. 2009), as amended (Nov. 3, 2009) (quoting same language). In addition, a pattern of retaliation—by analogy to a Title VII hostile work environment—may comprise a series of less serious actions: "[M]any separate but relatively minor instances of behavior directed against an employee may combine to make up a pattern of retaliatory behavior." *Maimone v. City of Atl. City,* 188 N.J. 221, 903 A.2d 1055, 1064 (2006) (internal quotations omitted).

CEPA claims are subject to the familiar *McDonnell Douglas* burden-shifting analysis. *Winters v. N. Hudson Reg'l Fire & Rescue,* 212 N.J. 67, 90, 50 A.3d 649, 662 (2012) (stating that *Grigoletti v. Ortho Pharm. Corp.,* 118 N.J. 89, 97, 570 A.2d 903 (1990) adopted the framework for Title VII disparate treatment claims stated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817 (1973) to CEPA claims). Under this test, the employee carries the initial burden of establishing a prime facie case of retaliation. *Winters,* 212 N.J. at 90, 50 A.3d at 662 (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S. Ct. 1817). The burden then shifts "'to the employer to articulate some legitimate, nondiscriminatory reason'" for the adverse employment action. *Winters,* 212 N.J. at 90, 50 A.3d at 662 (quoting *McDonnell Douglas,* 411 U.S. at 802, 93 S. Ct. 1817). If the employer can do so, "'the presumption of retaliatory discharge created by the prima facie case disappears and the burden shifts back to the [employee].'" *Id.* (quoting *Blackburn v. United Parcel Serv., Inc.,* 179 F.3d 81, 92 (3d Cir. 1999)). The employee then must persuade the "fact finder that the employer's reason was false 'and that [retaliation] was the real reason.'" *Id.*

(quoting *Blackburn,* 179 F.3d at 92 (internal quotation and citation omitted)). The ultimate burden of proof remains with the employee. *Id.* (citing *McDonnell Douglas,* 411 U.S. at 804–05, 93 S. Ct. 1817).

**1. Reasonable basis to believe defendants were violating a clear mandate of public policy**

First, I find that Turner's evidence fails to establish that he had an objective basis for a reasonable belief that NJSP personnel were violating a law, rule, or clear mandate of public policy. Whistleblowing activity under CEPA must relate to an identifiable "law, or a rule or regulation promulgated pursuant to law" N.J. Stat. Ann. § 34:19-3c(1), or else "a clear mandate of public policy concerning the public health, safety or welfare," N.J. Stat. Ann. § 34:19-3c(3). *Mehlman v. Mobil Oil Corp.*, 707 A.2d 1000, 1012–13 (N.J. 1998); *Dzwonar v. McDevitt*, 828 A.2d 893, 900–01 (N.J. 2003). The requirement of a law, rule, or regulation under section 3c(1) is clear enough. A "clear mandate of public policy" under section 3c(3) is a broader category, but is not unconfined. Such a mandate must at least "convey[] a legislative preference for a readily discernible course of action that is recognized to be in the public interest." *Massarano v. New Jersey Transit*, 948 A.2d 653, 662 (N.J. Super. Ct. App. Div. 2008). "'Clear mandate' . . . suggests an analog to a constitutional provision, statute, and rule or regulation promulgated pursuant to law such that, under Section 3c(3), there should be a high degree of public certitude in respect of acceptable versus unacceptable conduct." *Maw v. Advanced Clinical Comms., Inc.*, 846 A.2d 604, 607 (N.J. 2004) (emphasis in original).

The facts, as opposed to the conclusory accusations, asserted by Turner seem to establish at most that certain programs were late in supplying compliance data, a circumstance that was well known to the monitor. Turner says he subjectively believed this amounted to "fraud" and a willful avoidance of NJSP's obligations under the Consent Decree,[27] but he has not shown a

---

[27] In his affidavit, Turner asserts that he "refused to engage in fraud on the court," and rejected requests from his supervisor Lt. Flarity and from Lt. Wilson to change his

specific evidentiary basis for thinking that this opinion or belief was objectively reasonable.

Although it is a core fact as to which Turner bears the burden of proof, Turner never clearly lays out any specifics as to why he thought the Training Bureau was non-compliant with the Consent Decree. Nor does he point to evidence sufficient to establish the reasonableness of such a conclusion. He simply repeats that he found that certain programs, specifically those run by Wilson and Olcheski, were non-compliant. Turner's failure to adduce the necessary evidence is not excusable; this was Turner's job and primary responsibility, and there has been full discovery. As discussed in more detail below, this was a ten-year process, that occurred in phases; if there was "non-compliance" at any particular point, that noncompliance must be explained in relation to some standard.

Turner states that in the summer of 2005 he "conducted an assessment and reported [his] findings" that training programs run by Wilson and Olcheski were not compliant with the terms of the Consent Decree. (Turner Aff. ¶ 24) He offers no basis for, or even a clear description of, such "findings."

One alternative basis for a whistleblower allegation might be that Turner refused to participate in fraud or noncompliance with the Consent Decree. But there is no evidence of that. Turner complains of unpleasant interactions with his superiors, who disagreed with his statements regarding compliance. He says that noncompliance was hidden from the federal monitor—but he also acknowledges that, to the extent there was noncompliance, the monitor knew about it. He does not say, moreover, that *he* reported any noncompliance to the federal monitor. And the claim he does make must be examined carefully and compared to the evidence he cites in support.

Turner says that in 2005, federal monitor Mary Kheoloha *stated to Turner* (not the other way around) that the programs run by Wilson and

assessment that two training programs did not comply with the Consent Decree. (Turner Aff. ¶¶ 27–28)

Olcheski were non-compliant. Turner indicates agreement with that statement (he does not say that he *expressed* agreement to the monitor); and he does not state that he was the source of the information. (*Id.* ¶ 31)

The record support for Turner's assertion is a citation to page 63 of the Thirteenth Independent Monitors' Report (December 2005). There, Turner notes, "the monitor acknowledges that she was 'not provided with any written information that field implementation of training provided to various ranks since the last visit has occurred."[28] (Turner Aff. ¶ 32)

Here is Turner's explanation of the link between the allegedly missing written information and his own allegations of fraud and non–compliance: "[T]he reason the monitor did not have the data was because Wilson and Major White did not have any and the monitor reported it contrary to what defendant(s) and their counsel claim." (*Id.* ¶ 33) That statement has two parts, and I analyze them separately.

The second part of Mr. Turner's statement—that "the monitor reported it contrary to what defendant(s) and their counsel claim"—is hard to interpret. The overall implication seems to be that the Monitor herself found noncompliance. However, Turner has omitted the next page of the report.

---

[28] The Thirteenth Independent Monitors' Report (December 2005) states that "the monitors anticipate the availability of detailed analyses of [certain] impact evaluations for the fourteenth reporting period." (Pl. Opp. Ex. 4) Further:

> The monitoring team was not provided with any written information to demonstrate that field implementation of training provided to various ranks since the last site visit has occurred. In addition, when discussing newly proposed measures for some of the courses the monitoring team noted a lack of clarity regarding measurement benchmarks and measurement methodology.
>
> Status
>
> At the next site visit, written information related to implementation measurement will be expected by monitoring team, and will be reviewed for evidence demonstrating that data is being collected, analyzed, and a response to the analysis is instituted in order for this task and potentially related task 93 to remain in compliance.

*Id.*

There, the Monitor concludes that the NJSP was in compliance for Phase I and Phase II of the relevant task. (Def. Reply "Plaintiff's Affidavit Exhibit 1") The Monitor noted that compliance, which was to occur in phases, was not yet *complete*, but Turner's dire allegation of a fraudulent cover-up is not supported by this exhibit.[29]

I turn to the first part of Mr. Turner's statement. This appears to be an assertion that the Monitor was denied data because Wilson or White did not possess, or at least report, any data. There is no sufficient evidence, however, linking this to Turner's objectively reasonable belief that the Wilson and Olcheski programs were fraudulent or non-compliant at that particular phase.[30] The Monitor's report refers generally to "field implementation of training," but there is no clear basis for Turner's conclusion that this must have been a reference to Wilson's or Olcheski's program, his areas of concern.

---

29 Turner also states that Monitor Mary Kheoloha's "detailed findings were memorialized in draft version 13 of the federal monitoring report," and that Turner "read the report in its entirety on more than one occasion which was filed with the Office of Professional Standards and the Training Bureau during [his] tenure as a trooper." (Turner Aff. ¶ 31) It is not clear whether Turner refers to some draft of the Thirteenth Independent Monitors' Report, or whether he refers to the final version of that report. Either way, his statement sheds no light on whether his belief was objectively reasonable.

30 For actual evidence of noncompliance, Turner seems to substitute accounts of unpleasant interactions with his superiors, or statements indicating that they were hostile to the monitors' mission. According to Turner, in December 2005, he was summoned to a meeting with Olcheski (then his supervisor) and Flarity. Flarity instructed Turner to "'keep [his] big mouth shut' when speaking with federal monitors," that Turner must "say what we say, do not offer them information, do not tell them about any problems or deficiencies, they are the enemy." Flarity further warned Turner, "[You may have] outlived your usefulness, this has gotten all the way to the Colonel['s] office, people in the Office of State Police Affairs, the Major['s] Office, and they want to know if you are on the team or not." (Turner Aff. ¶ 37) Soon after, in January 2006, Major White instructed Turner that his future reports must reveal "positive results" concerning Consent Decree compliance, adding that the statistics "could be shaped to say whatever we wanted them to say." (*Id.* ¶ 40)

If there were record evidence specifying the basis for Turner's belief in noncompliance, Flarity's and White's purported statements might provide corroboration. There is no specific evidence, however, that Turner's belief that "fraud" was going on was reasonable and factually based.

Even setting that aside, Turner does not explain how a lag in data reporting at a particular time equates to "fraud" or non-compliance with the decree. At no point does he cite to any term of the Consent Decree, let alone a specific term requiring that particular data be collected or furnished at any particular time or in any particular way. From Turner's own evidence, it appears that the Monitor herself did not interpret the Consent Decree in that way—and the Monitor surely knew whether she was receiving required data or not. The report seems to suggest only that the Monitor expected that data regarding the training program would be furnished in the *next* reporting period. *See* n.28, *supra*.[31] That Turner personally thought the training program personnel should have acted with more alacrity does not equate to a clear mandate of public policy.

This record does not disclose an evidentiary basis to conclude that Turner's belief that fraud was occurring, or that the programs were non-compliant, was objectively reasonable. Turner has not set forth a prima facie showing of a CEPA claim; summary judgment would be appropriate on this basis.

**2. Causation/Nondiscriminatory basis**

In the alternative, I assume *arguendo* that whistleblowing activity occurred, and focus on whether Turner's evidence is sufficient to raise an issue as to whether retaliation occurred.

To make out a prima facie claim under CEPA, the plaintiff employee must demonstrate a causal connection between the whistleblowing activity and an adverse action by the employer. Under *McDonnell Douglas,* a prima facie case shifts the burden to the employer to state a legitimate, nonretaliatory

---

31 The record evidence regarding Turner's GACPS testimony is similarly unilluminating. He "alleged actions were taken by members of the Office of Professional Standards at some point in the past designed to mislead either the Office of State Police Affairs or the Independent Monitoring Team." (Pl. Opp. Ex. 10) He also "asserted that he was instructed on how to deceive the federal monitors conducting the oversight of the NJSP." (Pl. Opp. Ex. 11)

reason for the adverse action, which in turn shifts the burden back to the employee to rebut the employer's explanation. *See supra.* These issues are interrelated; all concern the causal link between the whistleblowing and the adverse action. For purposes of this section, I will assume that Turner engaged in whistleblowing activity. *But see* Section IV.A.1. Evidence of the necessary causal link is nevertheless lacking.

Even legitimate whistleblowing, of course, does not insulate an employee from justified adverse employment actions. Here, Turner focuses on his demotion in 2008, alleging that it was retaliatory.[32] The employer has

---

32 That focus was sharpened in oral argument. I dwell on the 2008 demotion because it may be the only adverse employment action within the one-year CEPA statute of limitations. N.J. Stat. Ann. § 34:19–5. Turner filed his original complaint in this action on October 20, 2008. A straightforward application of the statute of limitations would therefore exclude retaliation claims that accrued before October 20, 2007.

Where an employment action is "discrete" and independently actionable under CEPA, a plaintiff *must* bring suit on it within the one-year CEPA statute of limitations. Such discrete acts "are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 S. Ct. 2061, 2072 (2002); *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006).

Turner's evidence suggests only one such discrete act of retaliation occurring after October 20, 2007. Turner alleges that he became an Acting Lieutenant in 2007 (Def. Reply Ex. 5 at 295:1–4), but was demoted from that position in October 2008. (*See* Def. Mot. Ex. H) That 2008 demotion occurred within the CEPA limitations period.

Although Turner does not raise the issue, I consider that a series of acts might be timely asserted as a "pattern." Although "discrete" acts immediately trigger the running of the limitations period, a "pattern" of *nondiscrete* acts may constitute a continuing violation that runs into the limitations period. *See generally Green v. Jersey City Bd. of Educ.*, 828 A.2d 883, 891–92 (N.J. 2003) (citing *Nat'l R.R. Passenger Corp. v. Morgan, supra*). A hostile environment claim could be considered a continuing violation because it is "a series of separate acts that collectively constitute one 'unlawful employment practice'" under the substantive law. 536 U.S. at 117, 122 S. Ct. at 2074. Under CEPA, too, retaliation may also take the form of a pattern. It appears, however, that Turner's evidence would supports only a pattern dating from before the limitations period, which began on October 20, 2007

Finally, Turner seems to embrace a "relation back" theory to the date of filing of his state court action on February 20, 2007. The relation back doctrine, however, applies to amended pleadings within the same case. *See* Fed. R. Civ. P. 15(c)(1)(B); *Eng*

articulated a legitimate, nonretaliatory reason for the adverse employment action in 2008. Turner fails to point to sufficient evidence that the Defendants' articulated reason for the October 2008 demotion was false, and that the real motivation therefore must have been retaliatory. Whether viewed as a defect in the prima facie element of causation, or a failure to meet the shifting *McDonnell Douglas* burden, this failure is fatal to a CEPA claim.

Did Fuentes demote Turner in 2008 in retaliation for his whistleblowing activity? Turner himself does not seem to make any firm statement to that effect. Turner's Affidavit does not attribute the 2008 demotion to whistleblowing. His Complaint attributes it to disability discrimination. (*See* Compl. ¶ 121; *see also* Section IV.H, *infra.*) Indeed it is not clear that this 2008 demotion is asserted as CEPA retaliation at all.

At any rate, the Defendants have articulated, and supported with evidence, a legitimate, nonretaliatory rationale for the 2008 demotion. Defendants contend that Turner's "removal as Acting Lieutenant was generated by his failure to engage in the required Physical Fitness Program, C-20, and his refusal to seek an exemption therefrom in concert with the provisions of the applicable SOP, C-33." (Def. Mot. 43) "SOP" refers to Standing Operating Procedures, which are written policies of the NJSP. According to the cited SOP C33, section XIV.C: "All members are required to attend [the annual fitness for duty] examination with the following exceptions: 1. Members who are suspended during the entire evaluation period. 2. Members whom the Superintendent has placed into permanent disability duty status." (Def. Mot. Ex. F) Where an employee does not comply, the Superintendent may place the employee on "leave without pay status" and the employee's actions may be

---

*v. Cty. of Los Angeles*, 737 F. Supp. 2d 1078, 1099 (C.D. Cal. 2010) (rejecting argument that plaintiff's federal complaint "relates back" to plaintiff's state lawsuit because "the 'relation back' reasoning does not apply with equal force to actions that are, in actuality, entirely new or separate proceedings.") (citing *O'Donnell v. Vencor Inc.*, 466 F.3d 1104, 1111 (9th Cir. 2006)).

reviewed by OPS. (*Id.* Section XV.A) The other cited section, SOP C20 II.G, elaborates on the physical-fitness attendance requirement:

> 1. A member who has a medical or physical condition which prevents them from participating in a physical fitness test will appear at the testing site as scheduled unless they are on authorized sick leave. The member will be provided with both the New Jersey State Police Physical Testing File (form S.P. 59) and N.J.S.P. Physical Testing Non-Participation Acknowledgement Form (A.P. 60, Annex C).
> 2. The member's height and weight will be measured. A body fat analysis will be conducted as needed.

(SOP C20, Def. Reply Ex. 1)[33]

Turner was not suspended or on permanent disability status at any time in 2007–08. During the relevant period, then, he was not exempt from attending an annual Physical Fitness Program ("PFP") examination.

It is undisputed that Turner completed the physical fitness test in July 2007. (Compl. ¶ 73; Def. Mot. 61) Defendants submit evidence, however, that Turner failed to attend subsequent physical fitness tests through the date he went out on disability leave in July 2008 or thereafter. This evidence of non-attendance, they say, backs up the Superintendent's revocation of his Acting Lieutenant status. SOP C20 requires that even members who are physically unable to fully *participate* must nevertheless *report* to the testing site, unless excused. (Def. Mot. 61)

Turner does not contend that he reported to the testing site as required. There is no evidence in the record that he kept current on the annual fitness test.[34] Nor is there evidence that Turner obtained an exemption from the SOP

---

33 This version of SOP C20 was in effect from March 17, 2005, to April 18, 2011. With their moving papers, Defendants submitted the version that took effect in April 2011. In the quoted language of section II.G, however, there was no change between the pre and post 2011 versions.

34 The evidence, as I say, is lacking. But even Turner's Complaint is vague on whether he attended subsequent physical fitness tests. He alleges that in September 2007, January 2008, and April 2008 he exercised or used "a reasonable accommodation and abstained from participation in the DSP physical fitness test due

C20 attendance requirements, based on physical inability or any other reason.[35]

As of early July 2008, Turner had not attended the PFP for one year. (Def. Facts ¶ 15) On July 7, 2008, Turner was placed on temporary off-duty status. (Def. Facts ¶ 14; Compl. ¶ 94) Several days later, on July 24, 2008, Captain Robin Blaker completed a performance notice explaining that Turner was "non-compliant with the provisions of S.O.P. C20 and therefore subject to the sanctions stated therein." (Def. Mot. Ex. G; Def. Facts ¶ 16).[36] On October 23, 2008, Captain Blaker completed an intervention narrative noting Turner's SOP C20 non-compliance and recording that Turner had been advised, via a

---

to disability." (Compl. ¶¶ 74, 76, 92). Although he alleges that on each occasion he maintained compliance with DSP fitness standards (*id.*), he does not say how.

In the portion of his deposition testimony submitted by Defendants (to which Turner does not cite), Turner does state that he submitted a form to medical services to report that he could not participate in the fitness test. (Def. Reply Ex. 2 at 267:6–15) However, he does not state that he appeared at the test site as required.

His Statement of Material Facts restates his conclusory contention that he "participated in the form of an authorized reasonable accommodation." (Pl. Facts ¶¶ 13, 15) There is no supporting citation to the record. From all appearances, the "reasonable accommodation" is one he granted to himself.

[35] Turner implied at his deposition and at oral argument that explicit permission was not required, because the Superintendent was "aware of" Turner's "case." (Def. Mot. Ex. I 302:23–24) He further testified that the Superintendent visited him at his office in 2007, but that was not in regard to a C20 exemption because it was prior to Turner's becoming disabled. (Def. Mot. Ex. I 304:10–11) Although Turner stated in his deposition that he had asked the Superintendent for an exemption, he admitted that he never did so in writing, and he did not contend that he had personally conveyed the request directly to the Superintendent. (*Id.* 297:20–25) Rather, he "complained to Major Malman that I was being demoted and I should not be demoted," but Turner lacks personal knowledge that Superintendent Fuentes was informed. (*Id.* lines 12–13) The same is true for his complaint to "labor relations." (*Id.* at 299:20–25, 300:1–10) Moreover, there is no evidence that Turner's complaints over his demotion included any request for a C20 exemption.

[36] Turner claims that he never received the notice. The copy that Defendants have attached as Ex. G to their Motion does not contain Turner's signature acknowledging receipt, nor does it contain his supervisor's signature. (Def. Mot. Ex. G; Pl. Facts ¶ 16)

letter mailed on October 10, 2008, "of his removal from his out-of-title Unit Head position effective October 25, 2008."[37] (Def. Mot. Ex. H)

The evidence cited by Turner is insufficient to persuade a reasonable fact finder that the reason articulated by Defendants for his demotion is merely a pretext.[38] He has failed to raise a genuine dispute as to whether Superintendent Fuentes retaliated against him for protected whistleblowing activities. On this alternative ground, too, defendants will be granted summary judgment on Count 2 (CEPA).

**B. First Amendment Retaliation (Count 8)**

In his eighth cause of action, Turner alleges that "Defendants' actions amounted to violations of the Constitution of the United States, specifically, the First Amendment and the Fourteenth Amendment." (Compl., Count 8, ¶¶ 1–2) The Complaint offers no guidance as to the particular defendants and specific conduct that allegedly violated these Amendments.[39] Putting the Complaint together with the parties' summary judgment submissions I have attempted to define the claims. Turner alleges two different exercises of free speech rights that gave rise to retaliation. The first consisted of his complaints within the State Police hierarchy. The second consisted of his testimony before an

---

37 Turner claims that either the intervention narrative itself or the letter advising him of his demotion were never delivered. He admits that he was informed of his demotion in October 2008. (Pl. Facts ¶ 17)

38 In his Statement of Material Facts (which is not the proper place for argumentation), Turner states that the "SOP does not apply to or constrain any decision made by the Superintendent and is not relevant." (*E.g.*, Pl. Facts ¶ 39.b.) However, even if the Superintendent is empowered to override the SOP requirements, that fact does not negate Turner's failure to comply with the SOP and the legitimacy of any disciplinary consequences. Further, as noted above, there is no indication that Turner requested or received an exemption from the Superintendent.

39 I assume that Turner here cites the Fourteenth Amendment only insofar as it incorporates against the states the First Amendment protection of free speech. *See Schneider v. State of New Jersey,* 308 U.S. 147, 60 S. Ct. 146, 160 (1939). Turner makes no mention of the Fourteenth Amendment's Due Process or Equal Protection clauses here, and he asserts what amounts to an Equal Protection claim separately in Count 12 (albeit without mention of the Fourteenth Amendment).

advisory committee. From my own review of the record, I find no sufficient evidentiary basis for a claim of retaliation.

**1. Applicable standards**

Turner's claim of retaliation appears to arise under the free speech clause of the First Amendment. A plaintiff alleging a First Amendment retaliation claim must show: "(1) that the activity in question is protected by the First Amendment, and (2) that the protected activity was a substantial factor in the alleged retaliatory action." *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006) (citing *Phyllis Hill v. City of Scranton,* 411 F.3d 118, 125 (3d Cir. 2005)). "The first factor is a question of law; the second factor is a question of fact." *Id.* (citing *Curinga v. City of Clairton,* 357 F.3d 305, 310 (3d Cir. 2004)); *see also Baldassare v. New Jersey,* 250 F.3d 188, 195 (3d Cir. 2001).

Public employees, speaking as such, do not stand on the same ground as private citizens. A public employee's statement is entitled to First Amendment protection only when "(1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement he made." *Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 243 (3d Cir. 2016) (quoting *Gorum v. Sessoms*, 561 F.3d 179, 185 (3d Cir. 2009)).

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos,* 547 U.S. 410, 421, 126 S. Ct. 1951 (2006)). Reporting to superiors, for example, is unprotected because it does not have a "relevant analogue to speech by citizens who are not government employees." *Id.* Thus the Third Circuit has repeatedly held that "complaints up the chain of command about issues related to an employee's workplace

duties—for example, possible safety issues or misconduct by other employees—are within an employee's official duties" and therefore unprotected. *Morris v. Philadelphia Hous. Auth.*, 487 Fed. App'x 37 (3d Cir. 2012) (non-precedential) (holding that plaintiff's reporting instances of potential misconduct of subordinates to his superiors was within his official job duties); *Foraker v. Chaffinch*, 501 F.3d 231, 240 (3d Cir. 2007), *abrogated on other grounds by Borough of Duryea, Pa. v. Guarnieri*, __ U.S. __, 131 S. Ct. 2488 (2011) ("Price and Warren were acting within their job duties when they expressed their concerns up the chain of command . . . ."); *Hill v. Borough of Kutztown*, 455 F.3d at 242 (a town borough manager's reports to his superiors about harassment by the town mayor were not protected speech because his reports were made pursuant to his managerial duties)).[40]

**2. Retaliation for internal complaints**

First, Turner alleges that he reported non-compliance and sought an internal investigation, and that he was demoted, or not promoted, as a result.[41]

---

40 The chain of command, within a paramilitary organization like the State Police, has a particular meaning. *See Rivell v. Civil Serv. Comm'n*, 115 N.J. Super. 64, 72, 278 A.2d 218 (App. Div.), *cert. denied*, 59 N.J. 269, 281 A.2d 531 (1971), *rev'd on other grounds by Henry v. Rahway State Prison*, 81 N.J. 571, 410 A.2d 686 (1980) ("Many New Jersey cases indicate the importance of maintaining discipline within the paramilitary organization of a police department. Refusal to obey orders and disrespect cannot be tolerated. Such conduct adversely affects the morale and efficiency of the department."); *see also Anderson v. Burke Cty., Georgia*, 239 F.3d 1216, 1222 (11th Cir. 2001) ("In addition, a paramilitary organization, such as a fire department has a need to secure discipline, mutual respect, trust and particular efficiency among the ranks due to its status as a quasi-military entity different from other public employers.") (internal quotation and citation omitted); *Figueroa-Rodriguez v. Lopez-Rivera*, 878 F.2d 1488, 1489 (1st Cir. 1988) (noting paramilitary nature of fire departments); *Thorne v. City of El Segundo*, 726 F.2d 459, 470 n. 10 (9th Cir. 1983) (when paramilitary organizations are involved, the state's interest in regulating speech is greatest).

41 The allegations are confusing and imprecise. The protected speech in question, however, seems to consist of Turner's internal complaints within the NJSP.

Turner alleges that various persons at the NJSP told him not to report negative information to the monitor. At times Turner seems to imply that he nevertheless did report non-compliance to the federal monitor, but he never actually says that he did so. Indeed, he seems to state only that the monitor reported noncompliance *to him*,

(Compl. ¶¶ 29–30; *see also* Turner Aff. ¶ 49; Pl. Opp. 14) This claim fails as a matter of law because Turner (a public employee) was speaking pursuant to his official duties, whether about compliance or about the unfairness of being passed over. Turner does not allege that he was speaking as a citizen. In fact, in his own words, it was his "primary duty to conduct training audits to assess Consent Decree compliance." (Turner Aff. ¶ 19) In short, reporting to his superiors was central to his job duties. Thus, Turner's statements were not protected by the First Amendment. These allegations cannot support a First Amendment retaliation claim by a public employee.

**3. Retaliation for testimony before the GACPS**

Second, Turner alleges that he suffered retaliation for delivering testimony critical of the NJSP at a hearing held on November 21, 2006, by the Governor's Advisory Committee on Police Standards ("GACPS"). (Compl. ¶¶ 49–51; Turner Aff. ¶ 64) The allegation of retaliation is somewhat convoluted. According to the Complaint, on or about November 27, 2006, Turner was informed that he was under OPS investigation for falsely telling Wilson on September 26, 2006,[42] that he had not received a response to his July 2006 grievance. (Compl. ¶ 50) According to Turner, Wilson delayed responding to his grievance until October 2, 2006. (*Id.* ¶ 50) Turner seems to suggest an inference of retaliation because the timing of the investigation coincided with his statement to the GACPS on November 21, 2006. (*Id.* ¶ 51)

Turner's GACPS testimony is plausibly, if not very specifically, presented as protected speech. Here Turner was not reporting up any chain of command, but speaking to a legislative body, allegedly "in his capacity as a citizen." (Compl. ¶ 49) His GACPS testimony, he says, included allegations of misleading the Consent Decree monitoring team, a matter of public concern. (Pl. Opp. Ex.

---

and expresses agreement with her conclusions. (*See, e.g.*, Turner Aff. ¶¶ 27, 30–31) The monitor herself, however, states only that information reporting had lagged, and that she expected it to be reported in the next round.

42 According to record evidence, the meeting appears to have taken place one day later, on September 27, 2006.

10; *see also* Compl. ¶ 49) I will assume, then, that there was no "adequate justification for [Turner's superiors at the NJSP's] treating [Turner] differently from any other member of the general public" as a result of his having testified before the GACPS. Therefore, Turner's GACPS testimony may satisfy the first factor, *i.e.*, it may be protected speech.

However, Turner must still meet his burden under the second factor: "that the protected activity was a substantial factor in the alleged retaliatory action." *Hill*, 455 F.3d at 241. To do so, Turner must first show that the OPS investigation against him was "sufficient to deter a person of ordinary firmness from exercising" his or her rights. *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006). He must then establish a causal connection between his protected activity the alleged retaliatory conduct. *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). "To establish the requisite causal connection, a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Id.* A plaintiff may also show causation "from the evidence gleaned from the record as a whole." *Id.*

It is undisputed that there was an internal investigation of Turner, based on alleged false statements (unrelated to Consent Decree monitoring), which never resulted in any disciplinary action. (*See* Def. Mot. 31) The threshold for conduct "sufficient to deter a person of ordinary firmness" from exercising his or her First Amendment rights is a low one. *O'Connor v. City of Newark*, 440 F.3d 125, 128 (3d Cir. 2006) Once again, however, I consider the NJSP's military-style chain of command, which to the civilian outsider may appear harsh even in its ordinary operation. I do not lightly assume that a trooper of reasonable firmness would be deterred by the mere prospect of an internal investigation. I nevertheless assume it *arguendo* and proceed to the causation requirement.

When it comes to establishing a causal connection between the GACPS testimony and the internal investigation—*i.e.*, that the latter was in retaliation for the former—Turner's claim founders on the record evidence. The internal investigation was instituted and underway well *prior* to Turner's GACPS testimony. Consequently, the contention that the investigation was a retaliatory response to that testimony is unsustainable.[43] (Def. Mot. 31)

Turner does not respond to Defendants' timing argument in his opposition brief. Indeed, Turner's own affidavit establishes that Wilson filed the internal affairs complaint against Turner well before the GACPS testimony. (Turner Aff. ¶¶ 59–64)[44] If there is some theory under which the investigation could nevertheless have been retaliatory, Turner has not stated it. In short, Turner has failed to put forward evidence to support his claim of a causal relationship between his protected speech at the GACPS and the allegedly retaliatory internal investigation.

For the foregoing reasons, I find that Turner has failed to raise a genuine issue of material fact regarding his First Amendment retaliation claim. Accordingly, I will grant summary judgment for Defendants on Count 8.

---

43 Here are the circumstances of the internal investigation: Wilson filed a reportable incident form on September 29, 2006, stating that Turner's conduct on September 27, 2006 may have violated regulations, including one prohibiting the making of false or misleading official statements or intentionally misrepresenting facts. (Def. Mot. Ex. P) The OPS Intake and Adjudication Bureau had received Wilson's reportable incident form by October 5, 2006. (Def. Mot. Ex. R) On November 20, 2006, one day prior to Turner's GACPS testimony, Lt. Paul Manzo, who had been assigned to investigate the case, requested an extension of time to investigate the incident, stating that he had been preoccupied by other business for several weeks. (*Id.*) A memo with instructions for completing a response to the incident is dated November 21, 2006 and addressed from Manzo to Turner. (Def. Mot. Ex. Q)

44 Turner does state that Wilson and Dziobak threatened a new internal affairs investigation in January 2007. (Turner Aff. ¶¶ 68–70) Turner implies, however, that this threat was a reaction to a negative report Turner wrote, not his GACPS testimony. (*Id.*) I also note that Turner also alleged in his deposition testimony that Milgram retaliated against him for his GACPS testimony. (Def. Mot. Ex. I 219:25, 220:1–4) However, as noted above, Milgram was named in her capacity as an official only, and as such is immune from suit in federal court.

**C. Racial Discrimination (Count 12)**

In his twelfth cause of action, Turner alleges that he was passed over for a promotion based on his race. Turner alleges that as a white male he was "sanctioned, transferred, and demoted while on temporary medical leave and replaced with a lesser qualified, black, male directly preceding the release of a promotional vacancy list," to achieve stated "affirmative action goals." (Compl., Count 12) The Complaint does not specify the basis for this cause of action, but I will assume that Turner means to allege violations of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, or corresponding provisions of the New Jersey Constitution and state laws.

The Defendants assert, without citation, that this claim has been dismissed. (Def. Mot. 70) Turner himself makes no attempt to argue in his opposition brief that any such evidence exists.

At any rate, summary judgment is warranted because the record evidence is devoid of any mention of Turner's replacement by a NJSP trooper of a different race. There is no evidentiary support for even a prima facie case of racial discrimination against Turner.

Accordingly, I will grant summary judgment for Defendants on Count 12.

**D. New Jersey Constitutional Claims (Count 1)**

Turner's first cause of action alleges that Defendants violated his rights under the New Jersey Constitution, art. I, paragraphs 1, 5, 6, 18, and 19. He incorporates by reference all of the preceding paragraphs of the Complaint, and adds that "[a]s set forth herein, during his employment with Defendant New Jersey Division of State Police, SFC Turner was subjected to a pattern of retaliation and misconduct in the workplace contrary to the provision of the New Jersey Constitution that was based in part or in whole on his refusal to participate in misconduct or discrimination or engage in or conceal fraud." (Compl., Count 1, ¶ 2)

The Complaint does not specify which defendants violated which

constitutional provisions through what conduct. Neither discovery nor Turner's submissions do much to clarify the situation. When asked at his deposition to point to evidence of violations of his constitutional rights by Defendants, Turner provided only generalized references to the entirety of the pleadings. (Def. Mot. 71, citing Def. Mot. Ex. I, 186:7–20, 187:3–10) Turner makes no attempt to cite record evidence in his affidavit or elsewhere to support these alleged constitutional violations. My independent search of the record reveals no substantial evidentiary support for them.

Article I, Paragraph 1, provides New Jersey citizens with due process and equal protection rights: "All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." N.J. Const. art. I, ¶ 1. The record evidence does not support Turner's allegations that Defendants violated his due process or equal protection rights.

Paragraph 5 states: "No person shall be denied the enjoyment of any civil or military right, nor be discriminated against in the exercise of any civil . . . right . . . because of religious principles, race, color, ancestry or national origin." (N.J. Const. art. 1, ¶ 5) There is no evidence in the record that Turner experienced any discrimination on the basis of "religious principles, race, color, ancestry or national origin" at all, let alone by any of the individually named defendants.

Paragraphs 6 and 18 relate to the rights of free speech and assembly, and the right to petition for redress of grievances.[45] As Defendants note (Def. Mot. 28 n.1), the protections of the free speech clause of the New Jersey Constitution are "generally interpreted as co-extensive with the First

---

45 "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right." N.J. Const. art. I, ¶ 6. "The people have the right freely to assemble together, to consult for the common good, to make known their opinions to their representatives, and to petition for redress of grievances." N.J. Const. art. I, ¶ 18.

Amendment." *Borden v. Sch. Dist. of Twp. of E. Brunswick*, 523 F.3d 153, 164 n.5 (3d Cir. 2008) (quoting *Twp. of Pennsauken v. Schad,* 160 N.J. 156, 733 A.2d 1159, 1169 (1999)); *see also Garcia v. Speziale*, No. 10-CV-2637, 2015 WL 1307323, at *6 (D.N.J. Mar. 23, 2015) ("It is clear that in the context of retaliation, New Jersey courts rely on federal constitutional principles in interpreting the State Free Speech clause.") I therefore incorporate the discussion of First Amendment claims in Section IV.B, *supra*, and grant summary judgment as to this parallel State claim on the same basis.

Paragraph 19 states: "Persons in private employment shall have the right to organize and bargain collectively. Persons in public employment shall have the right to organize, present to and make known to the State, or any of its political subdivisions or agencies, their grievances and proposals through representatives of their own choosing." N.J. Const. art. I, ¶ 19. There is no evidence in the record that any of the individually named defendants violated Turner's rights to collective bargaining or presentation of grievances through a representative.

Accordingly, I will grant summary judgment to Defendants on Count 1.

### E. NJLAD Disability Discrimination and Failure to Make Reasonable Accommodation (Count 11)

In his eleventh cause of action, Turner alleges that Defendants discriminated against him based on his disability, failed to offer a reasonable accommodation, and unfairly sanctioned him for not participating in a fitness test. (Compl., Count 11, ¶¶ 4, 6) Additionally, he alleges that Defendants "applied a non-uniform strict approach to sanction plaintiff." (*Id.* ¶ 5) These allegations also appear to refer to Turner's removal as Acting Lieutenant in October 2008 by Superintendent Fuentes. *See* Section IV.A, *supra.*

In NJLAD discrimination cases, New Jersey courts apply the *McDonnell Douglas* burden-shifting framework. It has three parts: (1) the plaintiff must come forward with sufficient evidence to constitute a prima facie case of discrimination; (2) the defendant then must show a legitimate

nondiscriminatory reason for its decision; and (3) the plaintiff must then be given the opportunity to show that defendant's stated reason was merely a pretext or that it was discriminatory in its application. *Dixon v. Rutgers, The State Univ. of N.J.,* 110 N.J. 432, 541 A.2d 1046, 1051 (1988); *see also Zive v. Stanley Roberts, Inc.*, 182 N.J. 436, 449, 867 A.2d 1133, 1140 (2005).

As discussed above, Defendants submit evidence that Turner was not sanctioned for failing to participate in fitness tests while on disability leave; rather, he was sanctioned for noncompliance with the provisions of SOP C20, a distinct issue. The demotion process was set in motion before Turner went out on disability. Turner has failed to raise a genuine issue as to whether the reason articulated by Defendants was merely a pretext for retaliation based on his taking disability leave.

I turn to the failure-to-accommodate theory. A plaintiff asserting a claim for failure to accommodate a disability under the NJLAD must prove that: "(1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Ross v. New Jersey Dep't of Human Servs.*, No. A-0146-14T4, 2015 WL 11123301, at *4 (N.J. Super. Ct. App. Div. July 13, 2016) (quoting *Tynan v. Vicinage 13 of Superior Court,* 351 N.J. Super. 385, 400–401 (App. Div. 2002)).

Turner fails to address the accommodation *written into SOP C20 itself*: if he was unable to participate in the physical fitness test, all he had to do was appear at the test site, have his height and weight measured, and complete some paperwork. (SOP C20 § II.G., Def. Reply Ex. 1) Turner fails to explain why this accommodation was unreasonable, or why he was justified in failing to comply with it. Therefore, Turner has not demonstrated a genuine dispute as to elements three and four.

Turner adds the miscellaneous allegation that Defendants "applied a non-uniform strict approach to sanction" him. There is no evidence, however, that similarly situated NJSP members who did not comply with SOP C33 or SOP C20 were treated any differently.

Accordingly, I will grant summary judgment for Defendants on Count 11.

**F. NJLAD Hostile Work Environment/Retaliation (Count 6)**

In his sixth cause of action, also under NJLAD, Turner alleges that he "was subjected to a hostile work environment and retaliation based in part or in whole on his refusal to participate in misconduct and discrimination or engage in or conceal fraud." (Compl., Count 6, ¶ 2) Because there is no evidence that such "refusal to participate" related in any way to activity protected by the NJLAD, I will grant summary judgment to Defendants on Count 6.

These NJLAD claims, too, follow the *McDonnell Douglas* burden shifting analysis. *See* Section IV.E, *supra*. Fundamentally, however, the facts must bear some relation to the antidiscrimination concerns of the NJLAD. Thus, for example, it is not enough to show "retaliation" in some colloquial or generic sense; the retaliation must arise from "protected activity" under the NJLAD. Under N.J. Stat. Ann. § 10:5-12d, "a person engages in protected activity under the [NJ]LAD when that person opposes any practice rendered unlawful under the [NJ]LAD." *Young v. Hobart W. Grp.*, 385 N.J. Super. 448, 466, 897 A.2d 1063, 1073 (App. Div. 2005). The NJLAD makes it unlawful to discriminate based on race, national origin, age, sex, and other such characteristics. Turner alleges that he refused to go along with misconduct or fraud, but these are not matters made unlawful by the NJLAD. True, Count 6 mentions "discrimination," and refusal to participate in discrimination would certainly constitute protected activity under the NJLAD. However, the record contains not a scrap of evidence that Turner ever participated in, refused to participate in, or had anything to do with, discrimination.

The hostile work environment claim has a similar flaw. To establish a prima facie hostile work environment claim, the plaintiff employee must show (1) that the conduct complained of would not have occurred but for the employee's membership in a protected class, and (2) that the conduct was severe or pervasive enough to make a reasonable person believe that the conditions of employment were altered and the working environment was hostile or abusive. *Lehmann v. Toys 'R' Us, Inc.,* 132 N.J. 587, 626 A.2d 445, 453–54 (1993); *Taylor v. Metzger,* 152 N.J. 490, 706 A.2d 685, 688–89 (1998). Turner may believe that the work environment was "hostile" in some colloquial sense, but he makes no demonstration that he was a member of any class protected under the NJLAD. Here, too, Turner fails to make out a prima facie case.

Accordingly, I will grant summary judgment for Defendants on Count 6.

**G. NJLAD Retaliation (Count 3)**

In Turner's third cause of action, also under the NJLAD, he alleges that he "was subjected to retaliation in the workplace contrary to the provision of the NJ Law Against Discrimination based in part or in whole on his refusal to participate in racial discrimination against a black, female recruit." (Compl., Count 3, ¶ 2) The allegations underlying this Count are recited in paragraphs 82–91 of the Complaint, but allegations in a complaint are insufficient to repel summary judgment.

Defendants argue that the claim fails as a matter of law and should be dismissed. Turner entirely fails to respond: he makes no mention of the incident in his opposition brief or affidavit, and he cites no evidence to support these allegations.

Accordingly, I will grant summary judgment for Defendants on Count 3.

### H. FMLA—Interference and Retaliation (Count 9)

In his ninth cause of action, Turner alleges that Defendants violated his rights under the federal Family and Medical Leave Act ("FMLA").[46] Under the FMLA, eligible employees are entitled to take "a total of 12 work weeks of leave during any 12–month period" for "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). "Employees can sue for interference with the exercise of FMLA rights under 29 U.S.C. § 2615(a)(1). They can also sue under 29 U.S.C. § 2615(a)(2), if an employer retaliates against an employee for exercising her FMLA rights." *Lupyan v. Corinthian Colleges Inc.*, 761 F.3d 314, 318 (3d Cir. 2014).

Turner's summary judgment brief does not discuss the FMLA claim or point to any supporting evidence. His Complaint, however, asserts both interference and retaliation claims under the FMLA. (Compl., Count 9, ¶¶ 2-5, 6) I will probe the allegations of the Complaint in light of the record evidence.

Turner's interference claim fails because Turner does not so much as allege, let alone submit proof, that he was denied leave to which he was entitled. The elements of an FMLA interference claim are: "(1) [the plaintiff] was an eligible employee under the FMLA; (2) the defendant was an employer

---

46 Some of Turner's allegations in this count are better characterized as disability discrimination:

> 7. Defendants had knowledge of plaintiff's disability, offered him a reasonable accommodation of temporary off duty status, then sanctioned him for not participating in employer program.
>
> 8. Defendant had knowledge of plaintiff's condition and made no effort to offer reasonable accommodations so plaintiff could participate in employer program, even though, plaintiff could have with a small accommodation to prevent further injury to his person.
>
> 9. Plaintiff is a qualified individual, with a disability, who was retaliated against because of his disability.

(Compl., Count 9, ¶¶ 7–9) Another allegation is simply unrelated to the FMLA. (*Id.* ¶ 5) ("Defendants disclosed confidential medical information obtained through employment.")

subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA." *Ross v. Gilhuly*, 755 F.3d 185, 191–92 (3d Cir. 2014) (citations omitted). At the very least, Turner's claim for interference fails on the fifth element, because he does not allege or submit evidence that he sought and was denied FMLA-mandated leave.

Turner's retaliation claim fails as well, because it is not supported by record evidence. To establish a prima facie case of retaliation under the FMLA, Turner must show that "(1) [he] invoked [his] right to FMLA-qualifying leave, (2) [he] suffered an adverse employment decision, and (3) the adverse action was causally related to [his] invocation of rights." *Lupyan*, 761 F.3d at 324 (citing *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302, (3d Cir. 2012)).[47] Here, as elsewhere, the *McDonnell Douglas* analysis applies: Once a

---

47 Under certain Third Circuit precedent, an "adverse employment action," in the FMLA retaliation context, is an action that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 257 (3d Cir. 2014) (citing *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)).

The Third Circuit has not yet decided, however, whether the FMLA analysis should incorporate the lower standard for "adverse employment action" that the Supreme Court has adopted in Title VII retaliation claims. *Id.* at 257 n.6 (citing *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)). Under the more relaxed *Burlington* standard, "'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse,' such that the action well might have dissuaded a reasonable worker from taking a protected action." *Id.* (quoting *Burlington*, 548 U.S. at 68, 126 S. Ct. at 2405). As Judge Kugler has noted, "While the Third Circuit has never squarely held that this 'materially adverse' standard applies in the context of an FMLA retaliation claim, it has suggested that, were it necessary to address the issue, it would so hold." *Incorvati v. Best Buy Co.*, 2013 WL 3283956, at *4 (D.N.J June 27, 2013) (citing *Kasper v. County of Bucks*, No. 12–2504, 2013 WL 563342 at *5 (3d Cir. Feb.15, 2013) (assuming, "*arguendo*, that the *Burlington* . . . standard applies in the FMLA context"); *DiCampli v. Korman Communities*, 257 F. App'x 497, 500–01 (3d Cir. 2007) (applying the *Burlington* standard to an FMLA claim without further discussion)). I will therefore make the plaintiff-friendly assumption that the *Burlington* standard applies.

plaintiff has established a prima facie case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its decision. *Lichtenstein,* 691 F.3d at 302 (quoting *McDonnell Douglas,* 411 U.S. at 802, 93 S. Ct. 1817, 1824) "If the defendant meets this minimal burden, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably . . . disbelieve [the defendant's] articulated legitimate reasons." *Id.* (internal quotations and citations omitted).

The Complaint alleges that FMLA-based retaliation occurred on two occasions. First, Turner alleges that Defendants "counseled" him for skipping training at a time when he was on "family leave." (Compl., Count 9, ¶ 4) This apparently refers to a meeting in January 2007, when Wilson spoke to Turner about his non-attendance at pistol shoot training. According to Turner:

> On or about January 2007, I was Ordered to Wilson's office and issued a written counseling notice for not attending the pistol shoot while I was away on sick leave. Wilson was responsible for supervising the pistol shoot which was under state investigation for records falsification at the time because commanders were being ghosted in reports-they did not attend or participate in firearms qualifications-training bureau records indicated that they did. I filed a retaliation complaint against Wilson for counseling me while on I was sick leave and forwarded the complaint to the New Jersey Civil Rights Division.

(Turner Aff. ¶ 71)[48] Included in the record is an unsigned copy of Turner's New Jersey Civil Rights Division complaint, which includes this allegation:

> I took sick leave from October 2006 to January 2007. I returned to full duty in January 2007, but was counseled by Lt. Wilson for not attending training while on sick leave. I was informed that being on

---

48 According to the account in the Complaint, Wilson also counseled Turner for sick leave policy violations. (Compl. ¶ 57) ("On January 24, 2007, Lt. Wilson and Lt. Dziobak called Plaintiff to a meeting and counseled him for alleged violations of two standing operating procedures; specifically failure to attend training while Plaintiff was on sick leave and alleged sick leave policy violations, although no violations had occurred.") I note that the date in the Complaint conflicts with Turner's New Jersey Civil Rights Division complaint where he notes that the discrimination took place on January 15, 2007. (Pl. Opp. Ex. 12; *see also* Def. Mot. Ex. S)

> sick leave was no excuse, and subsequently, my annual performance evaluation reflected that I had missed training. This will further affect the promotion rankings process.

(Pl. Opp. Ex. 12) Also in the record is a special report from Turner to Olcheski explaining that Turner's "non-attendance at the Bi-Annual Pistol Shoot was due to illness." (*Id.*)[49]

I consider whether Wilson, in counseling Turner, subjected him to an "adverse employment decision." Clearly a counseling session would not meet the standard of materially altering the terms or conditions of his employment. Under the lower *Burlington* standard, *see* n. 47, *supra*, it is a closer case, but I still have no evidence that a mere "counseling" session would dissuade a reasonable officer from exercising his right to FMLA leave. Turner's affidavit does not identify any consequence flowing from the counseling, which never rose to the level of even informal disciplinary action.[50] Here again, I consider the paramilitary setting of the State Police, in which an employee may routinely expect to have his actions questioned, if not sanctioned. On balance, I cannot find that Turner has established an adverse employment action.

In the alternative, however, I find that Turner has not satisfied the remaining two steps of the *McDonnell Douglas* retaliation analysis. Assuming *arguendo* that Turner has successfully established a prima facie case of retaliation, Defendants have nevertheless articulated a legitimate, non-

---

49 Turner seems to contend that Wilson issued a "written counseling notice." (Turner Aff. ¶ 71) No such counseling notice appears in the record. Lt. Wilson's MAPPS journal entry documenting the meeting notes that Wilson was not "writing . . . up" Turner for this SOP violation, "nor did I [Wilson] wish to." (Def. Mot. Ex. S) Evidence that this conversation ever rose to the level of even informal disciplinary action is lacking.

50 His unsigned and undated New Jersey Civil Rights Division complaint, *supra*, (containing allegations, not evidence) alleges that a subsequent annual evaluation noted that he had missed training, and such an evaluation would affect his promotional ranking. (Pl. Opp. Ex. 12) The evaluation is not in the record. Turner does not identify who noted the missed training on the evaluation (whether Wilson or someone else), nor does he explicate the connection between Wilson's counseling and the evaluation notation.

retaliatory reason for Wilson's counseling of Turner. Turner, they say, was "on a mix of sick and vacation days when he missed training . . . and made no effort to make up his missed trainings." (Def. Mot. 56) Wilson's January 24, 2007 MAPPS journal entry documenting his conversation with Turner supports Defendants' articulated reason.[51] (Def. Mot. Ex. S) Lt. Wilson surely would have been justified in taking the limited step of conferring with, but not disciplining, Turner regarding his reasons for missing training. That is enough to shift the burden back to Turner.

Turner fails to point to any evidence from which a reasonable fact finder could disbelieve Defendants' articulated legitimate reason that Turner was not subjected to retaliation, but rather counseled for failing to make up missed pistol training. Turner does not deny that he missed training, nor does he deny that, when he missed training, he was on a mix of sick and vacation days. Turner never explains how Lt. Wilson was to obtain clarification of the situation, if not by asking. Nor does he even allege that he ever attended a makeup pistol shoot, or requested to do so.

Turner also alleges that Defendants "demoted and transferred plaintiff to a lesser post, sanctioned him by denying him a promotion, and humiliated him

---

51 Lt. Wilson records that he discussed with Turner and Lt. Dziobak the need for Turner "to attend [a] make up" session. He further explains:

> Pistol shoot is offered over an extended period of time. If on sick leave, that would be fine, however, there was ample opportunity to attend, vacation time was taken at various points and the required training was not attended as a consequence. I advised SFC Turner that I was disappointed that I had to have this type of conversation with someone of his experience and leadership position at the academy, but that it was necessary to ensure that equitable treatment was provided to all members within the Bureau. Next to another individual that was on extended medical leave, SFC Turner was the only other person at the academy who missed the shoot. He could have, and should have, made time to attend.

(Def. Mot. Ex. S)

in whole or in part for taking family leave."[52] (Compl., Count 9, ¶¶ 4, 6) This allegation apparently refers to events that occurred when Turner was on temporary off duty status from July 2008 to October 2008. (Compl. ¶¶ 94–105) As discussed above, in mid-October 2008, "[State Police] commanders sent SFC Turner a letter informing him that he was 'non-compliant' with the 'Physical Fitness Program.' As a result, 'sanctions' were going to be imposed against him." (*Id.* ¶ 104) The sanctions included the 2008 demotion from his acting lieutenant position. (*Id.* ¶ 105)

Superintendent Fuentes was the named defendant who would potentially have been responsible for the 2008 demotion. But even assuming *arguendo* that Turner has established a prima facie case of retaliation for his 2008 FMLA leave, he points to no evidence that casts doubt on the Defendants' articulated legitimate, non-retaliatory reason for sanctioning Turner.

Accordingly, I will grant summary judgment for Defendants on Count 9.

### I. New Jersey Family Leave Act (Count 10)

In his tenth cause of action, Turner seeks relief pursuant to the New Jersey Family Leave Act ("NJFLA").[53] N.J. Stat. Ann. § 34:11B-1 *et seq.* This count fails to state a claim as a matter of law. The NJLFA "only applies to employees who take leave to care for a family member, not employees on leave for their own injuries." *Bell v. KA Indus. Servs., LLC*, 567 F. Supp. 2d 701, 709 (D.N.J. 2008) (citing *Hampton v. Armand Corp.*, 364 N.J. Super. 194, 202 (App.

---

52 Turner also alleges that Defendants "complained to Plaintiff that his use of family leave interfered with operations." (Compl., Count 9, ¶ 3) However, there is no supporting evidence in the record. Similarly, in the Complaint, Turner alleges that Wilson called his residence repeatedly while Turner was on sick leave, persistently asking Turner to disclose his medical condition. Turner relented and "disclosed confidential medical information to stop Lt. Wilson from pressuring him." (Compl. ¶¶ 45–46) Nothing resembling this episode appears in Turner's affidavit or in other record evidence.

53 Confusingly, despite the heading referring to NJFLA, Turner also alleges a violation of the New Jersey Medical Leave Act. (Compl., Count 10, ¶ 2) There is no such Act, and I assume that Turner intends to refer to NJFLA. Turner also alleges a violation of the "New Jersey Medical Leave Act" in Count 11. (Compl., Count 11, ¶ 2)

Div. 2003)). Turner took leave time only in connection with his own medical needs, and therefore cannot seek relief under the NJFLA.

Accordingly, I will grant summary judgment for Defendants on Count 10.

**J. Civil RICO (Count 13)**

In his thirteenth cause of action, Turner asserts a civil RICO claim. The federal RICO statute, 18 U.S.C. § 1964(c), provides a cause of action for any person injured in his or her business or property by reason of a violation of section 1962.[54] The elements of a cause of action under section 1964(c) are "(1) a section 1962 violation and (2) an injury to business or property by reason of such violation." *Lightning Lube, Inc., v. Witco Corp.*, 4 F.3d 1153, 1187 (3d Cir. 1993). Turner's RICO claim is based on violations of two subsections of section 1962: 1962(b) and (c). (Compl., Count 13; RICO Case Statement at 2)

Sections 1962(b) and (c) prohibit acquiring or maintaining an interest in, or conducting the affairs of, an enterprise through a "pattern of racketeering activity." *See Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 518–19 (D.N.J. 2011) (citation omitted). A pattern of racketeering

---

54 Section 1964 provides:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964(c).

The subsections of Section 1962 cited by Turner provide:

> (b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.
>
> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(b)–(c).

requires "at least two acts of racketeering activity within a ten-year period." 18 U.S.C. § 1961(5).

Defendants argue, *inter alia*, that the record here does not create a genuine issue that there was a "pattern" of racketeering activity, or that the acts allegedly committed by any defendant were racketeering acts. (Def. Mot. 9) I agree that Turner has not supported his allegations of racketeering acts or a pattern of such activity. In many cases, the alleged racketeering acts consist of nothing more than a claim that the acts described above, which I have already found do not rise to the level of triable civil claims, constitute crimes.

**1. Predicate Acts**

Section 1961 of Title 18 provides an exhaustive list of predicate acts that constitute racketeering activity. *St. Clair v. Citizens Fin. Grp.*, 340 F. App'x 62, 66 (3d Cir. 2009) (citing *Annulli v. Panikkar,* 200 F.3d 189, 200 (3d Cir. 1999), *overruled on other grounds by Rotella v. Wood,* 528 U.S. 549, 120 S. Ct. 1075 (2000)). Those predicate acts are crimes, which must number at least two and must be committed within a ten-year period as part of a pattern.

Because the analysis in the papers is unclear or inadequate, I have fallen back on Mr. Turner's RICO case statement. Mr. Turner urges that the facts therein, because not denied, must be deemed admitted. As noted at p. 6, *supra*, a RICO Case Statement is not evidentiary, and does not require an answer. I do not consider statements therein as evidence for summary judgment purposes.[55]

The RICO Case Statement contains a list of citations to some seventeen statutes and constitutional provisions. (RICO Case Statement 7–8) That is

---

55 A RICO case statement pursuant to our District's Local Civil Rules, App'x O, is intended to assist in the processing of cases that contain Federal RICO claims.

In his RICO Case Statement, Turner cites the New Jersey RICO statute, N.J.S.A. 2C:41-1 *et seq.* (RICO Case Statement at 8, 37) The New Jersey RICO statute is not cited in the Complaint or any of the parties' papers on this motion. This stray citation in the RICO case statement is not sufficient to trigger a summary judgment analysis of a New Jersey State RICO claim.

followed by a numbered series of factual statements. (*Id.* at 9–12) Following that is a list of "Predicate Acts," numbered 1 through 15. (*Id.* at 12–22) Then the numbered factual statements resume.

Here, as elsewhere, I have found it helpful to do some initial review of Mr. Turner's broad allegations before analyzing the claims. *See* Section IV.J.1.a, immediately following. What remains after pruning are Predicate Acts 7–12 and 14, considered as potential criminal violations of the laws against obstruction of justice or witness tampering. In Section IV.J.1.b, I apply the surviving legal theories to the facts in connection with Predicate Act 14, which alleges acts of obstruction during an eight-month period in 2007. Finally, in Section IV.J.1.c, I apply the law to the facts in connection with Predicate Acts 7–12, which allege acts of obstruction in 2005–06. In sum, I find the evidence insufficient to satisfy the RICO requirement of a pattern of racketeering acts.

**(a) Facially inadequate legal theories and predicate acts**

As Predicate Acts, Turner cites a large number of federal and state offenses that are not, as a matter of law, RICO predicates. Of the fifteen enumerated Predicate Acts, fully eight of them—Predicate Acts 1–6, 13, and 15—are facially inadequate as a matter of fact and law.

To begin with, the RICO Case Statement cites many federal and state laws that are not contained in Section 1961(1)'s exhaustive list of predicate racketeering acts. The Case Statement cites, *inter alia,* 18 U.S.C. §§ 2, 3, 4, 371, 2261, and 3771; N.J. Const. art. I, § 22; and N.J. Stat. Ann. §§ 2C:29-2a, 2C:29-9, and 2C:30-2. (RICO Case Statement 7–8) These are not RICO predicates under 18 U.S.C. § 1961(1). Turner's discussion devotes particular attention to the subject of a conspiracy to defraud the United States under 18 U.S.C. § 371, sometimes called a "*Klein* conspiracy." *See United States v. Klein,* 247 F.2d 908, 915 (2d Cir. 1957). (Pl. Opp. 8–10) Section 371, however, is not a listed predicate under § 1961(1) (B), (C), or (E). Nor do the acts alleged fall within the more generic categories of § 1961(1)(A) or (D) (certain felony crimes of violence, drug offenses, obscenity offenses, bankruptcy and securities fraud).

*Cf. Odesser v. Vogel,* No. CIV.A. 85-6931, 1986 WL 12769, at *8 n.17 (E.D. Pa. Nov. 7, 1986) (§ 371 conspiracy to commit federal offense is not a RICO predicate, even if its object is a substantive offense listed in 18 U.S.C. § 1961(1)); *United States v. Persico*, 621 F. Supp. 842, 875 (S.D.N.Y. 1985).

Many of the Predicate Acts are alleged, at least in the alternative, to constitute "honest services" mail or wire fraud. *See* 18 U.S.C. § 1346.[56] The Supreme Court has limited the scope of honest services fraud to "fraudulent schemes to deprive another of honest services through bribes or kickbacks." *Skilling v. United States*, 561 U.S. 358, 130 S. Ct. 2896 (2010). Defendants argue that no specific facts in the record "suggest that any defendant solicited or received any bribe or kickback." (Def. Mot. 10–11) In response, Turner offers the conclusory assertion that he has supported these allegations factually, but he does not provide citations to the affidavits or exhibits. (Pl. Opp. 10) As legal authority, Turner cites *Boyle v. United States*, 556 U.S. 938, 129 S. Ct. 2237 (2009) (holding that an association-in-fact enterprise need not have a structure apart from that inherent in the pattern of racketeering activity). The relevance is unclear. My own review of the record has uncovered no evidence of deprivation of honest services through bribes or kickbacks. Nor is there adequate evidence of underlying wire transmissions or mailings in furtherance of a scheme to defraud.[57]

---

56 For the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

18 U.S.C. § 1346. The definition applies to schemes to defraud made illegal under 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

57 The record is also deficient as to other elements of mail or wire fraud. Mail fraud requires use of the U.S. mails (or certain couriers), and wire fraud requires an interstate transmission, in furtherance of the scheme and artifice to defraud. *See* 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud). In his RICO Statement, Turner states that he "knows" email was used or is "aware" that phone calls occurred (he does not say these were interstate communications). Certain mailings, he says, "may have occurred." These matters were to be "explored in discovery proceedings." (RICO Case Statement 25–26) If such discovery has occurred, the fruits of it have not been cited by Turner on this motion. The record does contain internal NJSP emails

Similarly, I find no evidence to support Turner's allegation that Defendants engaged in interstate travel in aid of a racketeering enterprise, in violation of 18 U.S.C. § 1952. (Def. Mot. 11 n.1) It appears that all of the matters alleged occurred within the State of New Jersey, and Turner does not offer any evidence to the contrary.

Even setting aside those legal inadequacies, the majority of the Predicate Acts (1–6, 13, and 15) do not have enough factual or legal substance to require further analysis. For the reasons stated herein, I will eliminate them now.

Predicate Act 1 alleges obstruction of justice committed by the "Office of Professional Standards (OPS)" in 2003. This Predicate Act does not seem to refer to any of the defendants remaining in the case, and no record evidence is cited for any act of obstruction in 2003.

Predicate Act 2 vaguely alleges conspiracy to defraud the government, and quid pro quo rewards in the form of promotions. I set aside the vagueness and lack of evidentiary support. The alleged violation, conspiracy to defraud the federal government in violation of 18 U.S.C. § 371, is not a listed RICO predicate under 18 U.S.C. § 1961(1). *See supra.*

Predicate Acts 3 and 4 relate to alleged retaliation against SFC Teryek. As support, it merely cites Teryek's state court suit. That suit has been dismissed, and the Appellate Division has affirmed the dismissal. *Teryek v. State*, No. A-3647-07T1, 2011 WL 977515 (N.J. Super. Ct. App. Div. Mar. 22, 2011). The mere fact that Teryek has brought suit does not constitute evidence for summary judgment purposes. In any event, Teryek's claims do not seem to relate to any claim for damages that Turner might assert.

Predicate Acts 5 and 6 relate to alleged retaliation against Sgt. Brian Royster. In support, however, Turner has provided only a 2012 news article reporting a state court judgment in Royster's favor against the NJSP and Colonel Fuentes, based on the Americans with Disabilities Act and CEPA. Any

---

regarding Turner, but no evidence of emails or phone calls, whether interstate or not, to or from the monitors.

disability-based discrimination alleged in that case surely applies only to Royster; Turner identifies no theory by which he could have been damaged. As for CEPA or retaliation, the Appellate Division has vacated the judgment and remanded for a new trial on both liability and damages. *Royster v. New Jersey State Police*, 439 N.J. Super. 554, 561, 110 A.3d 934, 938 (App. Div. 2015), *aff'd as modified*, 227 N.J. 482, 501, 152 A.3d 900, 911 (2017) (reinstating Royster's LAD failure-to-accommodate claim). As in the case of Teryek, the mere fact that Royster has sued is not evidence cognizable on summary judgment.

Predicate Act 13 relates to Defendants' alleged suppression of knowledge of the fraud and retaliation against Turner between December 2005 and September 2006. (*Id.* 20–21) The only defendant referred to in this allegation, however, is DAG Deisha Jackson. She has not been sued in her personal capacity, and any official capacity claim against her has already been dismissed on Eleventh Amendment grounds.

Predicate Act 15 relates to alleged obstruction of justice in the form of retaliation for Turner's having testified about corruption before the Governor's Advisory Committee on Police Standards ("GACPS").[58] This theory fails as a matter of law because a federal obstruction charge cannot be premised on interference with a State proceeding. *See Deck v. Engineered Laminates*, 349 F.3d 1253, 1257 (10th Cir. 2003). All three of the alleged obstruction-related offenses—18 U.S.C. §1503, §1512, or § 1513—have a federal-nexus requirement. Section 1503 requires a pending "judicial" proceeding in federal

---

58 I dispose of this Predicate Act on legal grounds, but I note also that the evidence that Turner actually revealed any corruption is general and conclusory. The record contains nothing specific about the concerns Turner allegedly raised about corruption. All that can be gleaned from the exhibits is that Turner made conclusory or passive-voice statements to the effect that "actions were taken by members of the Office of Professional Standards at some point in the past designed to mislead either the Office of State Police Affairs or the Independent Monitoring Team." (Pl. Opp. Ex. 10), and that "he was instructed on how to deceive the federal monitors conducting the oversight of the NJSP." (Pl. Opp. Ex. 11)

court. *See O'Malley v. N.Y. City Transit Auth.*, 896 F.2d 704, 707 (2d Cir. 1990). Section 1512 requires an "official proceeding," as defined,[59] though it need not be currently pending. Section 1513 would require a nexus to Turner's provision to a "law enforcement" officer of information relating to a federal offense. Predicate Act 15 alleges that Turner was punished for testifying in the State hearing, but there is no evidence that the *federal* authorities were in any way deprived of information about that testimony. To the extent this may be said to relate to an attempt to deprive the monitor of information—and such evidence is lacking—it would add nothing to the other obstruction allegations; the existence, or not, of the State hearing is superfluous.[60]

What remain as potential RICO predicate acts are certain obstruction-related offenses. The following offenses are at least potentially applicable: (1)

---

[59] Section 1515, in relevant part, defines the term "official proceeding" to mean:

> (A) a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;
>
> (B) a proceeding before the Congress;
>
> (C) a proceeding before a Federal Government agency which is authorized by law; or
>
> (D) a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce....

18 U.S.C. 1515(a)(1).

[60] Turner's affidavit also cites retaliation for his deposition testimony in a state court case, *Piniero v. New Jersey Div. of State Police*, 404 N.J. Super 194 (2008). To establish a federal nexus, Turner argues that *O'Connor v. City of Newark*, CIV 02-4318 (JAG) (D.N.J. Apr. 15, 2005), *aff'd,* 440 F.3d 125 (3d Cir. 2006), a federal case, was relevant to the same "matter" as *Piniero.* (Turner Aff. ¶ 18; *see also* Pl. Opp. 8) At the trial level, however, the federal case seems to have been completed in April 2005; defendants, when performing, *e.g.,* alleged acts of obstruction in 2007, could not have anticipated that Turner would be a witness in that closed case. Turner fails to explain how the claimed relation between the federal and state cases supports an obstruction claim. (Turner Aff. ¶¶ 14–15)

obstruction of justice in violation of 18 U.S.C. § 1503;[61] (2) retaliating against a witness in violation of 18 U.S.C. § 1513(e); (3) conspiracy to retaliate against a witness in violation of 18 U.S.C. § 1513(f);[62] and (4) tampering with a witness in violation of 18 U.S.C. § 1512(b).[63] (Compl., Count 13, ¶¶ 4–8; RICO Case Statement 7–8) I discuss the remaining alleged predicate acts in relation to those offenses.

**(b) Predicate Act 14**

Predicate Act 14 relates to obstruction of justice or witness tampering, amounting to indictable crimes, within an eight-month period between December 2006 and July 2007. (RICO Case Statement at 21) Those crimes consist of the interrelated offenses of obstruction of justice (18 U.S.C. § 1503); (2) retaliating against a witness, or conspiracy to do so (18 U.S.C. § 1513(e)–(f)); and witness tampering (18 U.S.C. § 1512(b)). All of these, which I will call the obstruction-related offenses, are based on alleged attempts to prevent Turner from reporting or testifying about noncompliance with the Consent Decree.

The various obstruction-related offenses are essentially alternative legal theories applied to similar facts. I review those legal theories as follows.

Title 18, U.S. Code, Section 1503 provides in relevant part:

> Whoever . . . corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection (b).

18 U.S.C. § 1503(a). A necessary element of a prima facie case of obstruction of justice under section 1503 is that the defendant "act[ed] corruptly with the

---

61 The Complaint refers to 18 U.S.C. § 1503(c). There is no subsection (c) in section 1503.

62 The Complaint states "18 USC 1513(e)(f)," and the RICO Case Statement sometimes cites "18 U.S.C. § 1613(f)(e)." I read these citations to allege a § 1513(f) conspiracy to violate § 1513(e).

63 The Complaint refers specifically to subsection (b) of § 1512; the RICO Case Statement refers nonspecifically to § 1512.

intent of influencing, obstructing, or impeding the proceeding in the due administration of justice." *United States v. Sussman,* 709 F.3d 155, 168 (3d Cir. 2013) (citing *In re Impounded,* 241 F.3d 308, 317 n.8 (3d Cir. 2001)).

Section 1512(b), and its potentially applicable subsections, provide:

> (b) Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to--
>
> (1) influence, delay, or prevent the testimony of any person in an official proceeding;
>
> (2) cause or induce any person to--
>
> (A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;
>
> . . . shall be [guilty of a felony offense].

18 U.S.C. § 1512. An affirmative defense is "that the conduct consisted solely of lawful conduct and that the defendant's sole intention was to encourage, induce, or cause the other person to testify truthfully." 18 U.S.C. § 1512(e).

Section 1513(e) provides:

> Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be [guilty of a felony offense].

18 U.S.C. § 1513(e). Subsection (f) of § 1513 criminalizes, *inter alia,* conspiracy to violate subsection (e).[64]

---

[64] There is a question of whether this ongoing monitoring pursuant to a Consent Decree can itself be regarded as a pending federal "judicial proceeding," as required by section 1503, or an "official proceeding" under section 1512(b)(1)–(2). The issue is a difficult one, as on-point precedent is lacking, though there are some suggestive analogies. *Compare United States v. Davis,* 183 F.3d 231 (3d Cir. 1999) (wiretap investigation, although court-authorized and monitored, is conducted by executive branch and is not a court proceeding), *with United States v. Sussman,* 709 F.3d 155 (3d Cir. 2013) (holding that judgment debtor's post-judgment removal of certain coins was covered by § 1503, and rejecting his argument "that the processes authorized by law for the collection of a judgment by a winning party are not 'judicial proceedings'"). It is easier to exclude § 1513, since the record does not establish that the monitors

In regard to Predicate Act 14, Turner's affidavit enumerates four events, all dating from January–July 2007, that could potentially amount to racketeering acts under the relevant obstruction-related statutes. The evidence, however, is insufficient to raise a genuine, material issue.

The first act of obstruction, according to Turner, occurred in January 2007. Wilson and Dziobak threatened him with an internal affairs investigation for making false statements, because Turner had reported that "no assessment had been conduct[ed]," even though a "needs assessment" had been conducted. (Turner Aff. ¶ 68) Turner states that he explained to them that there is a distinction between a "needs assessment" and an "assessment." (*Id.* ¶ 69) However, he opines that neither Wilson nor Dziobak "had any understanding of compliance reporting." (*Id.*) At best this suggests a misunderstanding, but Turner says nothing about the officers' response, if any, to his explanation. Presumably they were satisfied, however; there is no evidence of any followup, any disciplinary investigation, or any fallout of the kind that would obstruct judicial processes or discourage a potential witness (the witness being Turner himself).[65]

A second act of alleged obstruction likewise occurred in January 2007. Then, Turner was "counseled" by Wilson for failing to attend a pistol shoot while away on sick leave. (*Id.* ¶ 71) I have already discussed this event in connection with the FMLA retaliation claim. (*See* Section IV.H, *supra.*) I do not suggest that Sections 1503, 1512, and 1513(e) of Title 18 are subject to the same burden-shifting analysis as FMLA retaliation claims; nevertheless, the analysis above establishes that the counseling was undertaken for a legitimate purpose and did not lead to any discipline or other coercive sanction. A rational jury could not find that this rose to the level of obstruction or witness

were "law enforcement" officers or that Turner alerted them to the commission of a federal crime.

65 Turner says he filed a retaliation complaint, however. (*Id.* ¶ 71).

interference; still less does the evidence establish that Wilson had the necessary intent.

Third, Turner asserts that, in or around May 2007, Dziobak "threatened" Turner, called him "weird," and "generally harassed and threatened" Turner. (Turner Aff. ¶ 73) These conclusory statements do not add up to a criminal violation of §§ 1503, 1512, and 1513. Turner also states that "[a]gain, Dziobak threatened me with charges." *Id.* The e-mail exchange he attaches as support shows that Turner *complained* of retaliation, but contains no facts to show that Dziobak's actions *were* retaliatory. (Pl. Opp. Ex. 14) The incident or incidents are not described further in Turner's affidavit. Without more facts, nothing here would rise to the level of obstruction, coercion, or intentional interference with a federal witness.

Fourth, at some point in 2007, Wilson's attorney wrote to Turner to demand that he stop filing retaliation complaints against Wilson, or face litigation. (*Id.* ¶ 74) Turner responded by filing another retaliation complaint. (*Id.*) The threat of litigation, especially in response to repeated complaints filed against Wilson, may be expected. Without more, this threat to take legal action cannot constitute witness tampering, witness retaliation, or obstruction of justice. *See G-I Holdings, Inc. v. Baron & Budd*, 179 F. Supp. 2d 233, 266 (S.D.N.Y. 2001) ("[C]ourts have also rejected claims that threats of future litigation, or the initiation of actual litigation, constitute witness tampering.") (collecting cases); *see also Philadelphia Reserve Supply Co. v. Nowalk & Assocs., Inc.*, 1992 WL 210590, at *6 (E.D. Pa. Aug. 25, 1992) ("[W]aging a counterattack to civil litigation, without factual allegations of unlawful means, does not amount to witness intimidation.").

In short, there is no triable issue that the defendants committed the 2007 obstruction-related racketeering acts alleged as Predicate Act 14.

**(c) Predicate Acts 7 through 12/Pattern**

That leaves predicate acts 7 through 12. These involve alleged obstruction-related crimes in 2005–06. Defendants argue that there is

insufficient evidence that these acts occurred, and that even if they did, Turner cannot establish that they constituted a "pattern" of racketeering under 18 U.S.C. § 1961(5).

Predicate Acts 7 and 8 relate to Flarity, Olcheski, and Wilson's alleged attempt between September and December 2005 to convince Turner to participate in the alleged fraudulent reporting to the federal monitoring team in violation of 18 U.S.C. § 1503. (RICO Case Statement 16) As discussed in Section IV.A.1, *supra*, Turner has failed to bring forth sufficient evidence that the reporting of compliance was false or fraudulent (or even that he had a reasonable, fact-based belief that it was).

Predicate Acts 9 and 10, relating to Defendants' alleged deception of the federal monitors between September 2005 and September 2006 are likewise unsupported by specific evidence of record, as discussed above.

Predicate Acts 11 and 12 relate to Defendants' alleged acts against Turner for Turner's "unfavorable assessments [of Consent Decree compliance] and refusal to join in their conspiracies." (RICO Case Statement 18–20) In his RICO case statement, Turner alleges that "Gilbert, Flarity, Cuneo, Wilson, Olchesky, and others, intimidated, humiliated, harassed, and retaliated against Plaintiff repeatedly." To be sure, Turner has amply *alleged* employment-related conflicts with those individuals. But again, for the reasons expressed above, he has not set forth evidence of false or fraudulent reporting, or his reasonable belief that such fraud was occurring. Nor has he provided specific evidence to rebut his employer's legitimate reasons for, *e.g.*, disciplinary actions, or to establish a causal connection between such actions and any alleged intent to prevent him from testifying in a federal proceeding.

Even assuming that some or all of these obstruction offenses occurred, the plaintiff would have to further demonstrate that they fell into a "pattern of racketeering activity." To establish a pattern it is necessary, but not sufficient, to demonstrate "at least two acts of racketeering activity within a ten-year period." 18 U.S.C. § 1961(5); *see also Kehr Packages, Inc. v. Fidelcor, Inc.*, 926

F.2d 1406, 1411–12 (3d Cir. 1990). The plaintiff must also demonstrate that the "racketeering acts are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 232 (1989). Predicate acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Tabas v. Tabas,* 47 F.3d 1280, 1292 (3d Cir. 1995). The alleged predicate acts, for the most part, were "related," at least in the sense that they were all directed at Turner.

Turner fails, however, to satisfy the continuity requirement. The "continuity" requirement is not entirely, but "centrally a temporal concept." *H.J. Inc.*, 492 U.S. at 242. In the Third Circuit, duration is the "*sine qua non* of continuity." *Hindes v. Castle,* 937 F.2d 868, 873 (3d Cir. 1991). "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241. Continuity over a closed period of time may be demonstrated by "proving a series of related predicates extending over a substantial period of time." *Id.* at 242.

Turner's evidence cannot meet the test of open-ended continuity. The relevant alleged predicate acts all allegedly relate to Consent Decree reporting, and the Consent Decree was terminated on September 21, 2009. Order, *United States v. State of New Jersey,* 99-cv-05970 (D.N.J.), ECF no. 111. Therefore, there is and was no threat of repetition of the alleged predicate acts beyond that date.

Turner also cannot satisfy closed-ended continuity. In the Third Circuit, predicate acts spanning a year or less generally do not occupy the "substantial period of time" required for close-ended continuity. *See Tabas v. Tabas,* 47 F.3d 1280, 1293 (3d Cir. 1995); *Hughes v. Consol–Pennsylvania Coal Co.,* 945 F.2d 594, 610–11 (3d Cir. 1991) (fraudulent conduct lasting twelve months does not establish close-ended continuity); *but see Swistock v. Jones,* 884 F.2d

755, 759 (3d Cir. 1989) (fourteen-month period of conduct may be sufficient to establish close-ended continuity).

Even giving due consideration to the allegations in Turner's (non-evidentiary) RICO Case Statement, I cannot find that he has established predicate acts that are legally viable and supported by the minimum quantum of evidence, spanning more than one year. I focus here on Predicate Acts 7–14, the only ones even potentially viable. *See* Section IV.J.1.a, *supra*. The allegations in Predicate Acts 7–13 relate to conduct occurring within a one-year span between September 2005 and September 2006. (RICO Case Statement at 16–21) That in itself would not suffice to establish a pattern. Predicate Act 14, discussed above, attempts to expand the time frame; it relates to obstruction or witness tampering from December 2006 to July 2007. (RICO Case Statement at 21) For the reasons expressed in the preceding section, however, Turner has not adduced evidence sufficient to create a triable issue that violations of 18 U.S.C. §§ 1503, 1512, or 1513(e)–(f) occurred during that seven-month period.

What is left is a set of alleged predicate acts spanning less than one year. Even if Turner could establish them on this record, they would not add up to a continuous "pattern of racketeering activity."

For all of these reasons, I will grant summary judgment in favor of the defendants as to the substantive RICO claim, Count 13.

**K. RICO Conspiracy (Count 14)**

In his fourteenth cause of action, Turner asserts a RICO conspiracy claim under 18 U.S.C. § 1962(d), which states "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

In general, this conspiracy Count seems to be an add-on; Turner does not really allege an unconsummated, or merely agreed-upon, violation of RICO. So understood, the RICO conspiracy fails for the same reason that the substantive RICO claim failed: the RICO allegations and evidence, whether

considered substantively or as the object of a conspiracy, are inadequate as a matter of law.

I also consider the conspiracy allegations on their own terms, however. Even to plead a conspiracy under § 1962(d), "a plaintiff must set forth allegations that address the period of the conspiracy, the object of the conspiracy, and the certain actions of the alleged conspirators taken to achieve that purpose." *Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162, 1166 (3d Cir.1989) (emphasis added), *overruled on other grounds, Beck v. Prupis*, 529 U.S. 494, 120 S. Ct. 1608 (2000). The period of the conspiracy is material, because "[u]nderlying a § 1962(d) claim is the requirement that plaintiff must show that defendants agreed to the commission of a 'pattern of racketeering.'" *Breslin v. Brainard*, 2003 WL 22351297, at *13 (E.D. Pa. Oct. 14, 2003) (citing *Banks v. Wolk*, 918 F.2d 418, 421 (3d Cir. 1990)), *aff'd*, 128 F. App'x 237, 2005 WL 775846 (3d Cir. 2005).

A "pattern of racketeering," as noted above, must meet the requirements of relatedness and continuity, understood as "both a closed- and open-ended concept." *H.J. Inc.*, 492 U.S. at 241. As discussed, Turner cannot satisfy open-ended continuity. Further, in the Third Circuit, close-ended continuity is presumptively not satisfied by predicate acts spanning less than one year. *See Tabas v. Tabas*, 47 F.3d 1280, 1293 (3d Cir. 1995). The Complaint, however, does not set forth any time period for the conspiracy claim, and the RICO Case Statement fails to set forth a time period greater than one year for any of the alleged RICO conspiracies involving the remaining defendants and Turner.[66] Therefore, Turner has not adequately alleged, let alone substantiated factually,

---

66 I read the RICO Case Statement liberally and carry the time periods alleged for the substantive allegations over to the conspiracy allegations. Nevertheless, no conspiracy is alleged to have lasted longer than one year. Predicate Acts 7–8 allege a conspiracy during a three-month period between September 2005 and December 2005. Predicate Acts 9–12 allege a conspiracy from September 2005 to September 2006. Predicate Act 14 alleges a conspiracy during an eight-month period between December 2006 and July 2007. Predicate Acts 13 and 15 do not allege conspiracy.

that any defendant agreed to the commission of a continuous and ongoing "pattern of racketeering."

Accordingly, I will grant summary judgment in favor of the defendants as to Count 14.

**L. IIED and Negligence (Count 4)**

In Turner's fourth cause of action, he alleges that Defendants' conduct towards him constituted Intentional Infliction of Emotional Distress ("IIED"). (Compl. pp. 31-33) In another section, also titled "Fourth Cause of Action," Turner alleges that he was harmed by Defendants' negligent conduct. (Compl. pp. 33–35) Defendants argue that Turner's state tort claims fail because he has not demonstrated compliance with the notice requirement of the state Tort Claims Act. (Def. Mot. 65–69)

Under the New Jersey Tort Claims Act ("NJTCA"), a plaintiff in a tort action against a public entity or public employee must provide notice of his claim no later than ninety days after the claim has accrued. N.J. Stat. Ann. § 59:8–8 ("[A] claim relating to cause of action for . . . injury or damage to person or property shall be presented . . . not later than the ninetieth day after accrual of the cause of action."); *see also Carmichael v. Pennsauken Township. Bd. of Ed.*, 462 F. Supp. 2d 601, 616 (D.N.J. 2006) (stating that the notice requirement applies to "public employee[s]"). This notice requirement applies to all common law tort actions, including actions for IIED and negligence. *See Velez v. City of Jersey City,* 180 N.J. 284, 296, 850 A.2d 1238 (2004) (finding "no justification" for the notion that NJTCA's notice requirement did not apply to all "common law tort claims" against public employees liable under the Act). Where a plaintiff fails to provide notice, the suit will be dismissed. *See Lassoff v. New Jersey,* 414 F. Supp. 2d 483, 489 (D.N.J. 2006).

Defendants are all public entities or public employees within the meaning of the NJTCA. Turner does not allege that he complied with the NJTCA's notice requirement. His opposition to the defendants' summary judgment motion contains no response to Defendants' contention that he did

not comply with NJTCA. Reviewing the record, I find no evidence that any of Defendants ever received such notice within the statutory time frame. *See Epstein v. State,* 311 N.J. Super. 350, 355–56, 709 A.2d 1353 (App. Div.), *certif. denied,* 155 N.J. 589, 715 A.2d 992 (1998) (barring claims for, *inter alia,* malicious prosecution based on plaintiff's failure to file timely notice of claim with local public entity).

Turner's state law tort claims against Defendants cannot succeed because Turner failed to comply with the notice requirements of the NJTCA. Accordingly, I will grant summary judgment for Defendants on Count 4.

**M. Supervisory Liability**

Turner argues at different points that certain defendants should be held liable as supervisors for their subordinates' actions. (*E.g.*, Pl. Opp. 11 ("Defendant(s) failed to supervise[,] repeatedly placing troopers like Wilson, Dziobak, and Flarity in positions to intercept or conceal plaintiff[']s complaints over a period that extended for years.")) In general, supervisory liability requires some sort of personal involvement or fault. *See Parkell v. Danberg*, 833 F.3d 313, 330 (3d Cir. 2016) (federal constitutional claims); *Hottenstein v. City of Sea Isle City,* No. 11–740, 2013 WL 5603839, at *6 (D.N.J. Oct. 11, 2013) (NJCRA is interpreted analogously to Section 1983); *Delbridge v. Schaeffer,* 238 N.J. Super. 323, 354, 569 A.2d 872, 887–88 (applying personal involvement standard in tort claim against state officials and agencies).

The point, however, is moot in light of my rulings above. Whether personally involved or not, supervisors cannot be held vicariously liable unless someone committed an actionable violation of Turner's rights. *See Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) ("[A]ny claim that supervisors directed others to violate constitutional rights necessarily includes as an element an actual violation at the hands of subordinates.") Turner has established no triable claim. It follows that no vicarious supervisory liability can be imposed.

## V. Conclusion

It is a matter of public importance that the State police faithfully carry out their duties, including those imposed by the Consent Decree at issue here. It is also critical that employees who engage in protected activity not suffer retaliation. Nevertheless, Turner, as the plaintiff, bears the burden to come forward with sufficient proof, as opposed to accusations, establishing that this actually occurred. The importance of compliance with a Consent Decree cannot be used to inflate workplace disagreements and grievances into issues entitling plaintiff to an award of damages. Turner has not compiled a record sufficient to establish a genuine, material issue of fact requiring that his claims proceed to trial.

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED as to all counts and all defendants. An appropriate order follows.

Dated: March 29, 2017

**HON. KEVIN MCNULTY, U.S.D.J.**